## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| LEAR CAPITAL, INC.,[1] | Case No. 22-10165 (BLS) |
| Debtor. | |

## DECLARATION OF JOHN OHANESIAN, PRESIDENT AND CEO OF LEAR CAPITAL, INC., IN SUPPORT OF FIRST DAY MOTIONS

I, John Ohanesian, declare and state as follows:

1.        I am the Chief Executive Officer ("CEO") and President for Lear Capital, Inc., a California corporation ("Debtor" or the "Company") that has filed a voluntary petition (the "Chapter 11 Petition") under Chapter 11, Subchapter V, of title 11 of the United States Code (the "Bankruptcy Code"), commencing this Chapter 11 case (the "Case").

2.        To minimize the adverse effects of filing the Chapter 11 Petition while at the same time maximizing value for the benefit of stakeholders, the Debtor has filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings"). I submit this Declaration in support of the Chapter 11 Petition and the First Day Pleadings. I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize recoveries; and (c) best serves the Debtor's estate and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this Chapter 11 case.

---

[1] The last four digits of the Debtor's federal tax identification number are 7197. The Debtor's address is 1990 S. Bundy Drive, Suite 600, Los Angeles CA 90025.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  The Debtor has authorized me to submit this Declaration.

4.      I am also personally familiar with, and am custodian of, the records of the Debtor as they pertain to any of the Debtor's records submitted in support of the First Day Pleadings.  The records of the Debtor are made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record.  In general, the Debtor retains its files electronically in its computer files which are backed up regularly.

5.      I am a graduate of Sonoma State University and also earned a Masters from California State University, Long Beach.

6.      I began serving as the CEO of the Debtor in June 2017.  Prior to that, I was the President and CEO of Bosley, Inc. for over twenty (20) years.  During my time at Bosley, Inc., I grew the brand to over 90 markets, leading expansion into international territories, including Canada, Mexico, and Japan. I also expanded the Bosley, Inc. line of hair care products into 35,000 salons across North America.  While at Bosley, Inc., I established as Co-Founder & CEO, Aderans Research Institute, Inc., the research and development arm of Bosley.

7.      This Declaration is divided into four parts.  Part I sets forth an executive summary. Part II provides an overview of the Debtor's business, its corporate structure and its prepetition indebtedness.  Part III discusses the Debtor's recent financial performance, its proposed turnaround plan and the circumstances surrounding the commencement of this Chapter 11 case and what the Debtor views as the path forward.  Finally, Part IV sets forth relevant facts in support of the First Day Pleadings.

13480472/1

## I.   EXECUTIVE SUMMARY

8.      The Debtor was founded in 1997 and is a seller of gold and other precious metals. The Debtor is one of the largest in its industry, with customers all over the country.

9.      With an "Investor-Friendly Service Guarantee," the Debtor provides investors with the tools needed to securely purchase, sell and trade precious metals. The Debtor offers a diverse suite of intelligent investment resources including real-time pricing, regular e-mail alerts, newsletters, and personal account representatives to answer questions. The Debtor not only enables investors to stay current on the latest developments in the gold and precious metal market, but also gives investors the flexibility to move gold and precious metals as expeditiously as conventional paper investments.

10.     The Debtor's customers can arrange to have their precious metals shipped to themselves, stored in depositories under their control, or placed in self-directed individual retirement accounts ("IRAs") administered by third parties.

## II.   OVERVIEW OF THE DEBTOR'S BUSINESS

### A.   Historic Overview

11.     Since the Company's founding in 1997 by Kevin DeMeritt, the Company has experienced substantial growth.

12.     In 2020, gross revenues were $178,403,458 with net profit of $4,482,313; in 2021, gross revenues were $222,101,435 with net profit of $6,132,781.

### B.   The Debtor's Business Operations

13.     The Debtor has three office locations – its headquarters is located in Los Angeles, California and it also has offices in Woodland Hills, California and Newport Beach, California.

14.     In the ordinary course of business, the Debtor both sells and buys back precious metal across two different channels—direct to consumer ("Direct to Consumer Channel"), and through individual retirement accounts ("IRA Channel"). Sales made in the Direct to Consumer Channel are to individual consumers. Transactions in the IRA Channel are between the Debtor and

the custodians (each, a "Custodian") for precious metals that are held on behalf of customer individual retirement accounts ("IRAs").

15.     The Debtor's Direct to Consumer Channel accounted for 62% of its revenue in 2021, and the IRA Channel accounted for 38%.  Sales of precious metals in either of the Debtor's channels take time to complete.  In the Direct to Consumer Channel, sales can take up to 30 days to complete, and for the IRA Channel, sales can take up to 21 days to complete.  Sales can follow a variety of different steps, but for some sales, the Debtor receives the purchase price from customers before the product is delivered.  In 2021, for example, the Debtor closed each calendar month with an average of $12.0 million in funds received on account of direct to consumer sales that were in process.  The same number for the IRA Channel was $5.4 million.

16.     Similarly, buybacks are also not instantaneous transactions, with most transactions completed within 21 days.  For most buyback transactions in the Direct to Consumer Channel, the Debtor receives precious metals before making a payment to the customer.  For most buybacks in the IRA Channel, the Debtor makes the payment to the Custodian before the precious metals are received by the Debtor.

17.     Although the Debtor maintains two websites where customers may purchase precious metals completely online, the Debtor primarily transacts sales with customers over the telephone.

18.     The Debtor's prices for precious metals include its costs to acquire the inventory plus a profit or operating margin (sometimes called a "spread").  Depending on the transaction, the Debtor's markup can be as much as 33% (in 2021, the average markup was 25.32%) of the wholesale price paid by the Debtor to acquire the precious metal at issue.

19.     The overall price the Debtor charges (for any given coin or bar) is driven by market factors, including the current price of the coin or bar on the wholesale market and prevailing retail spreads in the industry.

20.     The Debtor provides each customer who contacts the Debtor by phone with a three-page shipping and transaction agreement (the "STA"). The STA is provided when the prospective customer first contacts the Debtor. The STA details the pricing, cancellation and refund policies.

21.     Once a customer approves his or her transaction, the Debtor's computer system automatically and contemporaneously sends an email confirmation to customers who have provided an email address, which most customers do.

22.     After the STA has been signed and (for non-IRA transactions) customer funds received, the precious metals are sent to the customer or his or her designated depository or Custodian as discussed above.

23.     With IRA transactions, the sequence is the same, except that the IRA administrator pays the Debtor after the transaction is complete and the Debtor submits an invoice to the administrator.

24.     The Debtor employs approximately 56 Employees and 6 independent contractors. The table below summarizes how this population is distributed across the Debtor's operations.

| Operation/Segment | Approx. Number of Employees |
|---|---|
| Senior/Junior Account Executives (Sales) | 39 |
| Dialers (Sales) ("Dialers") | 9 |
| Management/Officers/Directors ("Officers") | 3 |
| Back Office Staff ("Non-Sales Employees") | 11 |

The Senior/Junior Account Executives and the Dialers will be referred to herein as the "Sales Employees."

**C.      The Debtor's Corporate Organizational Structure**

25.     The Company is an S corporation, owned 100% by Kevin DeMeritt.

**D.      The Debtor's Prepetition Indebtedness**

26.     As of the Petition Date, the Debtor had a secured debt obligation to BOC on a line of credit in the amount of approximately $420,000 and was either current or ahead of known trade or ordinary course obligations.  As such, the only material debt obligations owed as of the Petition

Date constitute potential contingent, unliquidated, and disputed claims, as more fully described below.

### III.  RECENT FINANCIAL PERFORMANCE
### AND EVENTS LEADING TO THE CHAPTER 11 CASE

27.     The Debtor enjoyed significant growth from its inception.  When I came on as CEO, however, the Company needed to make some changes in its compliance program.

28.     The Debtor also laid off about one-half of the Debtor's sales people in late 2017 and early 2018 due to over staffing issues given the market demand for business.

29.     On June 5, 2019, the Los Angeles City Attorney's Office on behalf of the People of the State of California (the "LACAO") commenced a civil lawsuit against the Debtor for violation of the Unfair Competition Law in the Superior Court for the State of California, Los Angeles Division, Case No. 19STCV19362 (the "California Action").  The Debtor denies the allegations made in the California Action.

30.     The LACAO and the Debtor resolved the California Action pursuant to a Binding Agreement dated December 30, 2021, pursuant to which the Debtor paid $2.75 million and agreed to modify certain of its business practices, including but not limited to revising its invoices to include more prominent disclosure of the Debtor's fee structure and providing (to most buyers) a 24-hour, no risk cancellation policy to its customers following delivery of their written invoice. There was no admission of wrongdoing.  The Debtor put in place the agreed upon modifications before it filed this Case.

31.     On June 17, 2021, the People of the State of New York, by Letitia James, Attorney General of the State of New York ("NYAG"), commenced a special proceeding by Verified Petition in the Supreme Court of the State of New York, County of Erie, Index No. 807970/2021 (the "New York Action") against the Debtor and its principal.

32.     In the New York Action, the NYAG alleged, *inter alia*, that the Debtor offered and sold commodities through commodities contracts to the public in New York without first having

registered as a commodity broker dealer as required under New York law and that the Debtor engaged in deceptive business practices.  The Debtor disputed such allegations.

33.      Without admitting any wrongdoing, the Debtor and the NYAG resolved their disputes and resolved the New York Action pursuant to a Stipulation and Consent Decree filed on or about December 30, 2021.  As part of the resolution, inter alia, the Debtor paid to the NYAG (to compensate the Debtor's New York customers) the sum of $6 million (for engaging in unregistered sales), agreed to make changes to the format and content of invoices issued to future NY customers, and agreed to provide the same 24-hour cancellation policy (referenced above) to future NY customers.  The Debtor put in place the agreed upon modifications before it filed this Case.

34.      As a result of the settlements reached as discussed above, the Debtor amended its business practices to provide for at least a 24-hour cancellation policy, additional disclosures, including but not limited to how much the customer's metals need to increase in order to break even, and multiple forms of confirmation from the customer, both verbally and in writing.  While the Debtor believes it was operating within all appropriate legal mandates, it nonetheless made the changes to its business practices discussed above system-wide and nationwide.

35.      While no formal complaints are outstanding as of the Petition Date, the Debtor believes there may be potential claims of its customers or agencies that might be formalized in the future.  While the Debtor does not believe that it has any liability for such claims, the Debtor recognizes that the litigation of any such claims in multiple forums would be expensive and disruptive.  Accordingly, the Debtor filed for bankruptcy relief to address all potential claims in one forum.  Further, and importantly, the Debtor does not believe that its bankruptcy will have any effect on customer orders or cause any material delay in the processing of such orders. Accordingly, the Debtor commenced this Case because it believes it is the best and most efficient way to resolve any and all potential claims.

## IV.    **FIRST DAY PLEADINGS**

36.    Concurrently with the filing of this Case the Debtor filed the First Day Pleadings seeking relief related to the administration of this Case, the Debtor's operations, and the Debtor's creditors, customers and employees.  Below is a list of the First Day Pleadings:

a.    Emergency Motion for an Order Authorizing: (I) Maintenance Of Existing Bank Accounts, (II) Suspending the Requirements of Section 345(b); (III) Continued Use of Existing Cash Management System, and (IV) Continued Use of Business Forms Pursuant To 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 (the "Cash Management Motion");

b.    Emergency Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief (the "Wage Motion");

c.    Emergency Motion Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment; and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance (the "Utilities Motion");

d.    Emergency Motion for an Order Authorizing Debtor to Honor and Continue Certain Business Practices and Customer Obligations in the Ordinary Course of Business and Granting Related Relief (the "Business Practices Motion");

e.    Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Claims of Shippers and Warehouseman; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief (the "Shippers Motion");

f.    Emergency Motion for an Order (I) Authorizing Claims and Noticing Agent to Serve Commencement Notice and Approving 2002-1(b) List; (II) Authorizing Debtor to

File the Names and Contact Information of Customers Under Seal and Maintain Sealed Status; (III) Approving Form and Manner of Notice to Its Customers; and (IV) Granting Related Relief (the "Noticing Motion");

g.      Emergency Motion for an Order Under Sections 105(a), 363(b), 363(c) and 503(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Assume Existing Insurance Policies; and (b) Pay All Obligations in Respect Thereof (the "Insurance Motion");

h.      Emergency Motion Pursuant to Sections 105(a), 507(a)(8) and 541(d) of the Bankruptcy Code for an Interim and Final Order: (1) Authorizing Payment of Prepetition Sales Tax and Other Similar Taxes and Fees; and (2) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payments Requests Made Related to Such Taxes and Fees (the "Tax Motion"); and

i.      Application for Entry of an Order Authorizing Employment and Retention of BMC Group, Inc. as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date (the "BMC Application").

37.      The Debtor has narrowly tailored the First Day Pleadings to meet its goals of: (a) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of its key customer and employee constituencies during the bankruptcy process; and (c) establishing procedures for the efficient administration of this Case.

38.      I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers and advisors. I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

39.      It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Company's efforts to maximize the recovery to its creditors.

40.    The success of this Case depends upon the Debtor's ability to maintain its operations to the extent necessary to effectuate and confirm a plan of reorganization.   The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

41.    Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:

**The Cash Management Motion**

42.    Pursuant to 11 U.S.C. §§ 105(a), 345(b), and 363(c), the Debtor seeks authorization to maintain its existing Cash Management System.

43.    The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's day-to-day businesses.   The Cash Management System facilitates reporting, monitors collection, and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts required to effectuate the collection, disbursement, and movement of cash.  Because of the nature of the Debtor's businesses and the disruption that would result if they were forced to close their existing Bank Accounts and establish a new cash management system, it is critical that the existing Cash Management System remain in place.

44.    The Debtor maintains the following three (3) bank accounts at BOC: (1) general operating account (ending in 1731) ("Operating Account"); (2) depository account for incoming customer payments by wire only (ending in 1782) ("Depository Account") which is swept into the Operating Account every day; and (3) pledged line of credit account (ending in 4295)  in the amount of $500,000.00 which contains the collateral of BOC for the Line of Credit ("Line of Credit Account") (all collectively the "BOC Accounts").

45.    The Debtor has two (2) bank accounts at Axos as follows: (1) general operating account for the IRA side of the business (ending in 8676) ("IRA Operating Account" and

collectively with the Operating Account, the "Operating Accounts"); and (2) depository account for incoming customer payments by wire only (ending in 8684) ("IRA Depository Account") which is swept into the IRA Operating Account every day (all collectively the "Axos Accounts").

46.    The Depository Account and the IRA Depository Account are zero balance accounts that sweep daily to the Operating Account and the IRA Operating Account, respectively, meaning that they are zeroed out with a $0.00 balance at the end of every day. The Depository Account averages an inflow of funds of approximately $65,000 per day.  The IRA Depository Account averages an inflow of funds of approximately $200,000 per day.

47.    In addition, the Debtor has an account with M&T Bank located in Wilmington, Delaware, which will be designated as a debtor in possession account.

48.    The Debtor also has one (1) company credit card with American Express ("Amex"). The Debtor typically incurs credit card charges of approximately $600,000 per month and typically pays the balance in full every month.  The vast majority of charges on the Debtor's Credit Card Account are marketing related. The other charges are for much smaller vendors and some utilities. The Debtor expects that as of the Petition Date, there will be no outstanding charges owed to Amex.

49.    Finally, the Debtor has a merchant account for processing credit card payments with Cardflex ("Merchant Account").  Specifically, Cardflex collects the appropriate payment from the customer on behalf of the Debtor.  Cardflex deducts a fee rate of 2.49% and deposits the net amount into the Operating Account on a daily basis. The Debtor pays approximately $10,000 per month to Cardflex for the processing fees.  It is imperative that the Debtor maintain the Merchant Account so that the Debtor's credit card processing system is not disrupted.  Also, it would be very time consuming and expensive to process a transfer of the Merchant Account to a new provider.

50.    The Debtor also has a line of credit with BOC ("Line of Credit") pursuant to a Business Loan Agreement and related documents dated January 27, 2020.  The Line of Credit is

for a total of $500,000.00, of which a total of $420,000.00 is pledged.  Pursuant to an Assignment of Deposit Account, the Line of Credit is secured by a segregated bank account held at BOC.

51.     The Cash Management System preserves the orderly flow of cash and also permits the Debtor to accurately track income and expenses. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, accounting and reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts.  If the Bank Accounts had to be closed and new ones re-opened, it would disrupt the Debtor's business operations and greatly increase administrative expense.

52.     In addition, closing the Merchant Account would cause a severe disruption in the Debtor's cash flow. For one thing, deposits are made from the Merchant Account every day into the Operating Account.  The Debtor relies on this revenue for its operations.  Opening a new merchant account would also require extensive documentation with the credit card companies and could take weeks. If the Debtor is not authorized to keep the Merchant Account open, the credit card companies would be able to hold the Debtor's receipts for extensive time periods, which is cash the Debtor needs for operations and which could result in irreparable harm to the Debtor.

53.     Finally, closing the Credit Card Account and having to open a new credit card would cause a huge administrative burden on the Debtor.  The Debtor relies on the Credit Card Account to pay many of its vendors, including its marketing expense, which is crucial to the Debtor's operations. On the Petition Date, the Debtor expects there will be no outstanding transactions or a very *de minimis* amount outstanding.  Through the Motion, the Debtor seeks authority to continue using the Credit Card Account and prohibiting Amex from cancelling the Credit Card Account.

54.     BOC is in the process of signing a UDA with the U.S. Trustee in Region 3 and expects it will be complete before the final hearing on this Motion.  In any event, BOC is a trustworthy, well-capitalized and financially stable institution with a strong reputation and is also FDIC insured.  Further, the Debtor intends to wind down all of the BOC Accounts, other than the Line of Credit Account, as it transitions to M&T.  Were the Debtor to be required to wind down

all of the BOC Accounts, the Debtor would need to (i) surrender its collateral to BOC, (ii) find new letters of credit to replace the existing letters of credit, or (iii) provide other security to either BOC or the nondebtor parties for whom the Letters of Credit were issued. Each of these alternatives would be disruptive to the Debtor's reorganization efforts. As such, the Debtor is requesting authority to suspend the deposit requirements of section 345(b) of the Bankruptcy Code with respect to each of the BOC Accounts pending BOC's signing of the UDA for Region 3.

55.     To protect against the unauthorized payment of prepetition obligations, the Debtor represents that, if it is authorized to continue to use the Bank Accounts, it will not pay, and the Banks will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court

56.     Requiring the Debtor to close the Bank Accounts and to open new accounts will disrupt the Debtor's operations and materially distract the Debtor's management. It will disrupt the Debtor's operations because (a) any changes to the disbursement accounts will slow down the payment to crucial vendors as many are paid through electronic fund transfers, (b) any changes to its Merchant Account could disrupt and delay payment for credit card transactions made by the Debtor's customers; (c) having to close the Credit Card Account and open a new account would cause a huge administrative burden on the Debtor and would delay payment to important vendors; (d) it would increase the work of the Debtor's accounting personnel, who are already dealing with the many and varied issues related to the Case; and (e) it would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate.

57.     In addition, the Debtor requests that the Banks be permitted to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for all checks drawn on the Bank Accounts which are cashed at the Banks' counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date. The Debtor further requests that the Banks be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless: (a) authorized in an order of this Court, as represented to the Banks by the Debtor as set forth below;

13

(b) not otherwise prohibited by a "stop payment" request received by the Banks from the Debtor; and (c) supported by sufficient funds in the Bank Account in question.

58.    I believe closing the Bank Accounts will also increase the work of the Debtor's accounting personnel, who are already dealing with the many and varied issues related to this Case. Furthermore, closing the Bank Accounts and opening new ones would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate.

59.    In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor has and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (i) Bank services (the "Service Charges"), (ii) checks deposited with the Banks which have been dishonored or returned for insufficient funds in the applicable amount, and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "Bank Account Agreements").  The Debtor incurs an average of approximately $5,000.00 or less per month in Cash Management Claims and other approximately $5,000.00 in fees owed related the Merchant Account.  The Debtor seeks authority, in its sole discretion, to pay: (i) all undisputed prepetition Cash Management Claims; and (ii) any such routine Cash Management Claims that accrue to the Banks post-petition, in a monthly aggregate amount not to exceed $10,000.00 (excluding merchant/credit card fees).

60.    As with the Cash Management System, payment of the Cash Management Claims will minimize disruption to the Debtor's operations and is therefore in the best interests of the estate. Absent payment of the Cash Management Claims, the Banks might assert setoff rights against the funds in the Bank Accounts on account of the Cash Management Claims or freeze the Bank Accounts.

61.    In the ordinary course of business, the Debtor uses business letterhead, invoices, envelopes, promotional materials, and a number of other business forms and correspondence (collectively, the "Existing Forms").  Because the Existing Forms were used prepetition, they do

14

not reference the Debtor's current status as a debtor in possession. The Debtor is seeking authorization to continue using all Existing Forms in the forms existing immediately prior to the Petition Date.

62.     The Debtor is also requesting authorization to continue using its existing checks without the "Debtor in Possession" designation; provided, however, that if the Debtor is required to generate new checks during the pendency of the Case, then the checks will include this designation.

63.     I believe that most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the publicity of the Case and potential press coverage. Changing the Debtor's Existing Forms and checks would be expensive, unnecessary, and burdensome to the Debtor's estate.  Further, such changes would be disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.

64.     In connection with keeping the Bank Accounts open, the Debtor seeks an order authorizing and directing the Bank to honor postpetition checks, if any, drawn and transfers from the Bank Accounts.

65.     Further, in the event that the Bank refuses to honor a check drawn or a transfer made on a Bank Account maintained by the Debtor (provided there are sufficient good funds in the Bank Account to complete the transfer), the Bank must immediately turn over the deposits held in the applicable Bank Account upon the Debtor's request.

66.     I believe preserving the Cash Management System will enable the Debtor to continue to track all receipts and payments accurately and to provide complete reporting to the UST.

67.     In sum, the Bank Accounts and Cash Management System facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's business. Because of the disruption to the business that would result if the Debtor were forced to close these

15

Bank Accounts, I believe it is critical that the Debtor maintain its Cash Management System and the Bank Accounts.

**The Wage Motion**

68.     The Debtor filed the Wage Motion seeking the entry of an interim and final order, authorizing but not directing, the Debtor, in its discretion, to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "Prepetition Obligations") to or for the benefit of their current employees (individually, an "Employee" or collectively, the "Employees"), for wages, compensation, severance, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtor prior to the Petition Date (as described below, individually, "Employee Program" or collectively, the "Employee Programs") and have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests.

69.     The Debtor employs approximately 56 Employees and 6 independent contractors. The table below summarizes how this population is distributed across the Debtor's operations.

| Operation/Segment | Approx. Percentage |
|---|---|
| Senior/Junior Account Executives (Sales) | 39 |
| Dialers (Sales) ("Dialers") | 9 |
| Management/Officers/Directors ("Officers") | 3 |
| Back Office Staff ("Non-Sales Employees") | 11 |

The Senior/Junior Account Executives and the Dialers described above will be collectively referred to herein as the "Sales Employees."

70.     I believe it is absolutely critical that the Debtor be able to assure the Employees that their wages, compensation and salaries ("Wages") and the Employee Programs will continue unaffected by their chapter 11 filings in order to effectuate a successful outcome in the Case. Moreover, if the Debtor fails to pay the Prepetition Obligations and fails to continue the Employee Programs in the ordinary course, the Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative

impact on workforce morale and would likely result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

71.    The Debtor paid payroll to the Officers, the Non-Sales Employees, and the Dialers (collectively referred to herein as the "Bi-weekly Payroll Employees") on February 23, 2022 for the two (2) week period ending February 20, 2022.  As such, the Bi-weekly Payroll Employees will accrue wages and other Pre-Petition Obligations for the period of February 21, 2022 through March 1, 2022 for which the Debtor seeks authority to pay post-petition in the ordinary course on March 9, 2022.  None of the Employees will receive more than the maximum amount provided for in Section 507(a)(4).

72.    The Debtor also paid Commissions on or about March 1, 2022 to the Sales Employees for the month of February.  As such, Commissions will accrue for the period of March 1 through March 2, 2022 for which the Debtor seeks authority to pay post-petition in the ordinary course.  None of the Employees will receive more than the maximum amount provided for in Section 507(a)(4).

73.    The Prepetition Payroll Obligations owed by the Debtor are summarized below[2]:

| Category | Amount |
| --- | --- |
| Employee Wages (including estimated Commissions) | $160,000.00 |
| Withholding Obligations | $63,000.00 |
| Obligations to Independent Contractors | $15,000.00 |
| Employee Business Expenses and Reimbursements | $15,000.00 |
| Employee Health Benefits - Medical and Dental Insurance | $12,000.00 |
| Employee Vision Insurance | $200.00 |
| Life, Accidental Death and Dismemberment | $2,000.00 |
| Flex Spending | $800.00 |
| Total Employee Compensation Owed | $268,000.00 |

74.    Just a few of the Debtor's Employees receive their paycheck via a physical check. While the Debtor expects that there will be no outstanding checks for Pre-Petition Obligations for Wages that have not yet cleared the Debtor's bank accounts, in an abundance of caution, the Debtor seeks authority through this Motion for any checks for Pre-Petition Obligations that have not yet

---

[2] The amounts included are approximate amounts and may fluctuate. In addition, for certain of the categories, the Debtor does not believe they owe any amounts prepetition. However, the Debtor includes these categories to the extent it is discovered that amounts are, in fact, due prepetition.

cleared the Debtor's bank accounts to be honored post-petition. In the event there are any outstanding checks, the Debtor estimates the amount of such checks will total less than $20,000.

75.     The Bi-weekly Payroll Employees are paid bi-weekly, each approximately two (2) days in arrears. Bi-weekly payroll averages $115,000.00. The Debtor's payroll payments are made by Paychex Payroll Services ("Paychex") through a separate contractual arrangement, which requires the Debtor to fund its obligations to Paychex by way of reverse wires from the relevant operating account or disbursement account one (1) day prior to each pay date and the same day for payroll taxes and garnishments.

76.     The Senior/Junior Account Executives (Sales) are paid semi-monthly. On or about the 16th day of every month, they are paid a set amount based on the minimum daily rate for the number of days worked for the first fifteen (15) days of the month. The semi-monthly payroll for the Senior/Junior Account Executives (Sales) for the first fifteen (15) days of the month averages $115,000. At the end of the month, the Senior/Junior Account Executives (Sales) are paid the greater of: (1) the minimum daily rate for the number of days worked for the second half of the month; or (2) their total commission earned for the month less the payment received for the first fifteen (15) days of the month (the "Commission"). For example, if the Senior/Junior Account Executives (Sales) receives $2,500 for the first fifteen (15) days of the month and then makes a total commission for the month of $2,500, the Senior/Junior Account Executives (Sales) will receive the minimum daily rate for the number of days worked in the second half of the month. But if the Senior/Junior Account Executives (Sales) makes a total commission for the month of $6,000, the Sales Employee will receive $3,500 at the end of the month ($6,000 less $2,500). The Commissions are generally paid between the 4th and 7th of every month and averages approximately $1 million per month. For February, however, the Debtor paid the Commissions prior to the Petition Date.

77.     Further, as of the Petition Date, the Debtor, through Paychex, made deductions from the Employees' paychecks for payments on behalf of the Employees for various federal, state, and local income, FICA, and other taxes, as well as for garnishments, support payments and

tax levies, savings programs, benefit plans, flexible savings accounts, insurance programs, credit unions, and other similar programs on account of which the Debtor deducts a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "<u>Deductions</u>").

78.    By virtue of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.  I estimate that as of the Petition Date, accrued but unpaid wages and commissions for the Employees is approximately $160,000.00.  In addition, the applicable Deductions may not have yet been taken. To the extent Deductions have been taken, however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions. I estimate that, as of the Petition Date, they are holding Deductions already taken aggregating approximately $78,000.00 which the Debtor seeks to pay to third parties in accordance with their prepetition practice.

79.    The Debtor estimates that, as of the Petition Date, accrued but unpaid compensation, including the Deductions, totals approximately $268,000.00. The Debtor seeks authority to pay, continue, or otherwise honor their Prepetition Obligations in the ordinary course of their businesses. None of the amounts to be paid to the Employees for pre-petition wages will exceed the $13,650 cap set forth in Bankruptcy Code Section 507(a)(4).  The Debtor believes that the costs associated with paying such amounts are relatively minimal compared with the damage to the Debtor's estate that would follow if employee morale were harmed by the Debtor's failure to meet its payroll obligations.

80.    The Debtor, in the ordinary course of its business, reimburses the Employees for certain business related expenses that the Employees incur.  These include expenses for travel, mileage, office supplies, and other incidental expenses.  The monthly reimbursable expense is fairly small but it is essential to the continued operation of the Debtor's business that the Debtor be permitted to continue reimbursing the Employees for such business expenses.

81.    The Debtor requires that, to be reimbursed for business expenses, an Employee must submit expense reports, together with appropriate supporting documentation. The Debtor

19

expects that the total amount of unreimbursed business expenses as of the Petition Date will be $0.00, but certainly will not exceed $15,000.00.

<u>Vacation and Sick Time</u>

82.    As part of their overall compensation, Non-Sales Employees and Officers are entitled to receive a certain number of vacation hours per year.  The Sales Employees (including dialers) are not eligible for vacation time.   Vacation time starts to accrue immediately upon employment.  Other than with respect to two of the Debtor's Officers, vacation time accrues as follows: In the first year of employment, the Employee accrues one week of vacation leave per year; an Employee working for the Debtor between 2 and 4 years accrues two weeks of vacation leave per year; an Employee working for the Debtor between 5 and 14 years accrues 3 weeks of vacation leave per year; and an Employee working for the Debtor more than 14 years accrues 4 weeks of vacation leave per year.  Any unused vacation time rolls over from year to year but can never accumulate to more than 1.5 times the allotted vacation leave days.  For example, if an Employee has 2 weeks of vacation time, the Employee can only accrue 3 weeks of vacation time before he/she stops accruing time.  Once an Employee has the maximum, the Employee will stop accruing vacation leave until some of it is used. Upon termination or retirement, an Employee generally receives "cash out" payments for any accrued and unused vacation days.

83.    All Employees accrue sick leave.  Sick leave begins accruing immediately but Employees cannot use sick time until they have been employed for ninety (90) days. Sick leave accrues at a rate of 3 days per year for all Employees.  Sick leave carries over up to a maximum of three (3) days.

84.    The Debtor estimates that, as of the Petition Date, total accrued but unpaid vacation leave is approximately 1,682 hours (or $158,000) and accrued but unpaid sick leave is approximately 888 hours (or $60,000).  By the Wage Motion, the Debtor is not seeking to pay such sums to the Employees but does seek authority for the Employees to use their accrued vacation

and sick time in the ordinary course of business pursuant to the Debtor's policies and procedures regardless of the maximum amount provided for in Section 507(a)(4).

85.    By this Motion, the Debtor also requests authority for the Employees to use their accrued but unpaid sick and vacation leave time in the ordinary course of business pursuant to the Debtor's policies and procedures regardless and notwithstanding the maximum amount provided for in Section 507(a)(4).

Medical, Dental and Vision Insurance

86.    The Debtor offers various PPO and HMO plans with Blue Shield of California ("Blue Shield") to the Non-Sales Employees and to the Officers for medical insurance (the "Medical Plan").  The Debtor also offers an ASI supplemental medical plan to the Officers and Non-Sales Employees that are on the PPO Bronze plan.  As of the Petition Date, approximately 41 Employees were participating in one of the medical insurance plans, 13 of which participate in the ASI supplemental plan.  The Debtor pays 100% of the premiums for those employees.  The cost per month to the Debtor for the Medical Plan is approximately $21,216.84.

87.    The Debtor offers dental insurance to the Non-Sales Employees and to the Officers through Ameritas (the "Dental Plan").  The Debtor pays 100% of the premiums for those employees.  As of the Petition Date, approximately 15 Employees were participating in the Dental Plan.   The cost per month to the Debtor for the Dental Plan is approximately $1,917.96.

88.    The Debtor offers vision insurance to the Non-Sales Employees and to the Officers through Ameritas (the "Vision Plan").  The Debtor pays 100% of the premiums for those employees.  As of the Petition Date, approximately 44 employees were participating in the Vision Plan.  The cost per month to the Debtor for the Vision Plan is approximately $212.04

89.    Sales Employees are offered medical, dental and vision insurance.  If they choose to opt into the Medical Plan, the Dental Plan, and/or the Vision Plan, the Debtor pays $100 of the premium per month and the employee is responsible for the remainder of the premiums.

13480472/1

### Life, Accidental Death and Dismemberment

90.    The Debtor provides all Non-Sales Employees and Officers with a policy for life insurance and accidental death and dismemberment in the amount of $50,000 through Mutual of Omaha (the "Life Plan") with an option for the employee to purchase an additional amount.

### FSA Account

91.    The Debtor provides eligible Employees with an option to contribute to a flex spending account ("FSA") through Paychex ("FSA Plan"). As of the Petition Date, approximately 12 of the Employees subscribe to the FSA Plan.

92.    As required by statute, the Debtor provides the Employees a workers' compensation benefit program ("Workers' Compensation Program") for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses (the "WC Insurance"). The WC Insurance is provided through third-party insurers. The annual cost of the WC Insurance is approximately $67,789.

### Bonus Program

93.    Other than with respect to one (1) Officer whose bonus is covered by his employment agreement, all Non-Sales Employees and Officers are eligible for the bonus program. There are two (2) potential bonuses to be paid out. The first is based on annual net income and is capped at 50% of the employee's salary. In particular, if annual net income is over $12 million, the bonus is 100%; if annual net income is over $10 million but less than $12 million, the bonus is 75%; if annual net income is over $8 million but less than $10 million, the bonus is 50%; and if annual net income is over $5.5 million but under $8 million, the bonus is 25%.

94.    The other program is based on IRA sales. If the annual IRA full sales exceed $50 million, the employee will receive no more than 0.000075% of the sales.

95.    Bonuses are paid once per year, usually in January. Bonuses for 2021 were paid in late December 2021 in the total amount of approximately $3.5 million.

96.     By virtue of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.   In addition, the applicable Deductions may not have yet been taken.  To the extent Deductions have been taken, however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions.

97.     Prior to the Petition Date, the Debtor paid certain of its Prepetition Obligations with checks that had not been presented for payment as of the Petition Date.  In order to ensure the orderly payment of the Prepetition Obligations, the Debtor requests that the Court enter an order requiring the Debtor's banks to honor any such checks which are drawn on the Debtor's accounts, and authorizing the banks to rely on the representations of the Debtor as to which checks are subject to the Motion.   To the extent that any such checks are refused payment, the Debtor additionally requests authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

98.     With respect to the compensation and the Employee Programs described above, the Debtor contracts with several vendors to administer and deliver payments or other benefits to their Employees (the "Administrators").   In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtor for reimbursement of payments made.  For example, the Debtor, in the ordinary course of business, pays Paychex as its third-party payroll administrator fees of approximately $2,400 per month.

99.     In conjunction with the Debtor's payment of compensation and other benefits, the Debtor believes that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees.  The Debtor believes that the Administrators may terminate their services to the Debtor unless the Debtor pays the Administrators' prepetition claims for administrative services rendered.  A need to replace any one of the Administrators postpetition likely would cause significant disruption to the payment of

benefits and other obligations to the Employees. Accordingly, the Debtor submits that the payment of claims owed to the Administrators is in the best interest of the Debtor's estate.

100.    Prior to the Petition Date, the Debtor paid certain of its Prepetition Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Obligations, the Debtor requests that the Court enter an order requiring the Debtor's banks to honor any such checks which are drawn on the Debtor's accounts, and authorizing the banks to rely on the representations of the Debtor as to which checks are subject to the Motion. To the extent that any such checks are refused payment, the Debtor additionally requests authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

101.    I believe it is absolutely critical that the Debtor be able to assure its Employees that the Employee Programs will continue unaffected by their Chapter 11 filings in order to effectuate a successful outcome in this case. The Debtor's employees are the backbone of its businesses and maintenance of employee morale is absolutely essential to Debtor's ability to conduct business and ultimately sell their assets for the highest value. I believe that any deterioration in employee morale at this time will substantially and adversely impact Debtor's business operations and revenue. If, by consequence of the Chapter 11 filing, there is interruption in the Debtor's ability to honor wages incurred prior to the Petition Date, I believe employees may suffer extreme personal hardship and, in some cases, may cease working. The inevitable consequence would be employee defections, unmanageable staff turnover, resentment, loss of goodwill and, at the very least, disintegration of employee morale.

102.    Furthermore, I believe that authorizing the Debtor to honor the Employee Programs is consistent with the Debtor's duties and is being performed in the ordinary course of business.

103.    The Debtor represents that it will not distribute any amounts over $13,650 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) it not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of (i) the number

of Employees covered by such plan multiplied by $13,650, less (ii) the aggregate amount of prepetition Wages and ordinary course bonus payments, plus the aggregate amount paid by the Debtor on behalf of such Employees to any other employee benefit plan, as provided under section 507(a)(5) of the Bankruptcy Code; and (c) they will not pay any amounts in excess of the estimated outstanding prepetition cap amounts for each category of prepetition claims identified in the chart above without further order from this Court, except to the extent required under state law.

### The Utilities Motion

104.    In the normal course of its business, the Debtor obtains Utility Services provided by a number of entities (each a "Utility Company" and collectively, the "Utility Companies"). The Debtor pays the Utility Companies, on average, approximately $55,000.00 per month for services rendered. To the best of my knowledge, prior to the commencement of this case, the Debtor generally was current with respect to undisputed invoices for Utility Services. I believe that on the Petition Date, there will be no outstanding payments to the Utility Companies.

105.    Based upon cash flow from operations, the Debtor expects to have ample liquidity to pay timely all postpetition obligations owed to the Utility Companies.

106.    However, to provide adequate assurance to the Utility Companies as required under section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit on account of each Utility Company listed on the Utilities List (as may be amended) an amount equal to the value of two (2) weeks of Utility Services provided by the Utility Company, based upon the Debtor's estimated average monthly bill as set forth in more detail in the Utility Motion.

107.    If the Utility Motion is not approved, the Debtor could be forced to address requests by its Utility Companies in a disorganized manner during the critical first weeks of this case. Moreover, the Debtor could be blindsided by a Utility Company unilaterally deciding on or after the 30th day following the Petition Date that it is not adequately protected and subsequently discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of Utility Services could potentially shut down operations, and any significant

disruption of operations could put this Case in jeopardy. As such, I believe it is imperative that the Utility Motion be granted on an emergency basis.

### The Business Practices Motion

108. Prior to the Petition Date, in the ordinary course of business and as is customary in the Debtor's industry, the Debtor created and implemented various business practices to facilitate and streamline transactions and to develop and sustain positive and loyal customer relationships (the "Business Practices"). On account of the Business Practices, the Debtor may owe certain obligations to its customers as well as other third parties, arising both before and after the Petition Date (collectively, the "Customer Obligations").

109. The Business Practices include the following: (i) a policy—mandated by recent consent decrees with various prosecutors and/or applicable state law—that allows customers to cancel recent transactions and obtain a full refund ("Refund Policy"); and (ii) obligations to fulfill orders on account of funds or product already received (the "Selling and Buyback Programs").

110. First, as discussed above, the Debtor is required under either applicable law or recent consent decrees to provide customers with at least 24 hours (measured from the time that the purchase order confirmation is delivered to the customer) to cancel any purchase and receive a full refund. This timeframe can be, and often is, extended by the Debtor in its discretion in order to address customer satisfaction. The terms of the Refund Policy are stated clearly on every invoice.

111. On the Petition Date, the Debtor does not expect there to be any outstanding refunds owed to customers although there likely will be recent sales still subject to the 24 hour cancellation policy. The Debtor seeks to honor the Refund Policy with respect to all of these sales, and any additional sales that the Debtor deems appropriate in its business judgment in order to preserve its operations and customer goodwill.

112. As discussed above, in the ordinary course of business, the Debtor both sells and buys back precious metal across two different channels -- Direct to Consumer Channels and IRA Channels. In each of these channels, as of the Petition Date, as part of transactions in process the

Debtor may have received either funds or metals, with delivery or other performance to take place postpetition.

113.    Sales of precious metals in either of the Debtor's channels take time to complete. In the Direct to Consumer Channel, sales can take up to 30 days to complete, and for the IRA Channel sales can take up to 21 days to complete.  Sales can follow a variety of different steps, but for some sales the Debtor receives the purchase price from customers before the product is delivered.  In 2021, for example, the Debtor closed each calendar month with an average of $12.0 million in funds received on account of direct to consumer sales that were in process, the same number for the IRA Channel was $5.4 million.

114.    Similarly, buybacks are also not instantaneous transactions, with most transactions completed within 21 days.  For most buyback transactions in the Direct to Consumer Channel, the Debtor receives precious metals before making a payment to the customer; for most buybacks in the IRA Channel, the Debtor makes the payment to the Custodian before the precious metals are received by the Debtor.

115.    Based on the timing of the above sales and buybacks, it is possible that on the Petition Date, funds or precious metals may have been received by the Debtor, with payment to be made postpetition.  The Debtor expects there will be no more than $250,000.00 owed by the Debtor on the Petition Date for precious metal it has received but not yet paid for, most of which consists of checks that have been issued but not yet cleared the Debtor's bank.  In the case of a buyback, where the Debtor has received the precious metals but has not yet paid for the precious metals, absent payment, the customer could likely assert reclamation, setoff or deposit claims against the Debtor.

116.    As such, the Debtor requests authority to continue its Selling and Buyback Programs, including payment of any pre-petition amounts due as a result of the timing issues discussed above.  The Debtor further requests that the Customer Obligations be granted administrative priority status pursuant to § 503(b) of the Bankruptcy Code.

117.    Failing to honor and continue with the Business Practices would be catastrophic to the Debtor's business.   The Debtor operates in a highly competitive market; its primary competitive advantage is customer loyalty built on trust that transactions will be completed expeditiously and as expected.   Any inability of the Debtor to promptly honor the Customer Obligations will damage goodwill and may lead to the loss of customers.   As such, the Debtor seeks authority to maintain and administer the Business Practices and to honor Customer Obligations in the ordinary course of business.

118.    The Debtor is requesting the relief sought in the Customer Obligation Motion be granted on an emergency basis because the uninterrupted customer programs are essential to the Debtor's ability to seamlessly operate under Chapter 11.   The Debtor recognizes that treating customers well is a top priority and their customers may be its most valuable commodity.

**The Shippers Motion**

119.    Critical to the Debtor's operations are the (a) reputable common carriers, movers, shippers and freight forwarders (collectively, the "Shippers"), and (b) warehouseman, storage facilities, loading and unloading services, and other providers of storage services (collectively, the "Warehousemen"), that transport and store the gold and other precious metals (the "Goods").

120.    The Debtor and its customers depend on the timely delivery of the Goods. Given that the Shippers and Warehousemen have physical custody over many of the Debtor's Goods, it is essential for the Debtor to incentivize its Shippers and Warehousemen to continue performing and providing the Goods to its customers in a timely manner.   If the Shippers and Warehousemen do not receive payment for their prepetition claims, they may not continue to ship the Goods on behalf of the Debtor and the Debtor in return would not be able to meet its customer commitments.   This could result in significant operational issues and increased expenses.

121.    Under certain applicable laws, a Shipper or a Warehouseman may have a possessory lien on the Goods in its possession, which secures the charges or expenses incurred

in connection with the transportation or storage of the Goods.  In addition, pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection for valid possessory liens, which could hinder the Debtor's ability to sell such Goods free and clear of such asserted liens.

122.    On average, the Debtor incurs approximately $110,000 per month in charges to its Shippers and Warehousemen.  The Debtor does not expect to have any outstanding invoices for accrued, unbilled charges for Goods that were delivered prior to the Petition Date (the "Shipping and Warehousing Charges").  Out of an abundance of caution, however, the Debtor requests authority to pay up to $55,000 in Shipping and Warehousing Charges postpetition. If the Debtor fails to pay any Shipping and Warehousing Charges, certain Shippers and Warehousemen could argue that they are entitled to possessory liens for transportation and/or storage, with respect to the Goods in their possession and may refuse to deliver or release such Goods before their claims have been satisfied and their liens redeemed.  Even if any Shipper and Warehousemen did not have valid liens, their possession and retention of the Goods could severely disrupt the Debtor's business operations.

123.    The value of the Goods in the possession of the Shippers and Warehousemen, coupled with the potential injury to the Debtor if the Goods are not delivered or released, exceeds the amount of the Shipping and Warehousing Charges that the Debtor seeks to pay under this Motion.  The Debtor believes that it is necessary and essential to preserving the value of its estate that it be permitted to make payments on account of certain Shippers and Warehousing Charges.

124.    In order to ensure that the Debtor has continued access to goods and services provided by the Shippers and Warehousemen (collectively, the "Claimants"), the Debtor will condition payment of any prepetition amounts owed to any Claimant (the "Claims") upon verification that such Claimant will continue to abide by the parties' customary trade terms (the "Customary Trade Terms") as described in the Shippers Motion. To the extent any Claimant accepts payment from the Debtor premised on their compliance with terms set forth

29

in the Shippers Motion and thereafter fails to comply, the Debtor requests that any payment made to such a Claimant on account of prepetition obligations be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code recoverable in cash by the Debtor upon written request.  Upon recovery by the Debtor of any such payment, the claim for which payment was recovered would be reinstated as a prepetition claim in the amount recovered, less any costs incurred by the Debtor.

125.    The Debtor will maintain a listing summarizing the name of each Claimant that received payment on their claim, the amount paid to each of the Claimants on account of their Claim, and the goods or services provided by such Claimants.

**The Noticing Motion**

126.    By the Noticing Motion, the Debtor seeks entry of an order: (a) authorizing the claims and noticing agent to serve the commencement notice, (b) approving 2002-1(b) List; (c) authorizing Debtor to keep the names and contact information of its customers under seal; and (d) approving the form and manner of notice to its customers.

127.    The Debtor has thousands of customers throughout the country.  I believe that the vast majority of the customers will likely not have claims to assert in this Case.  Given the voluminous nature of the detail regarding its customers, providing a list including each customer and his or her address would be burdensome and time-consuming and would result in a significant waste of the estate's resources.

128.    As discussed below, to ensure that the Debtor provides sufficient notice of this Case to its customers, the Debtor is seeking to implement separate notice procedures with respect to its customers.  Because the customers will receive sufficient notice of this Case by virtue of these separate service procedures, the Debtor submits that filing a list of all customers will serve no independent purpose.

129.    Moreover, the Debtor has concurrently filed an application (the "Agent Application") seeking the appointment of BMC Group, Inc. ("Agent" or "BMC") as its claims and noticing agent in this Case.

30

130.    In choosing BMC as the Debtor's Agent, I obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, based on all engagement proposals I obtained and reviewed, it appears that BMC's rates are competitive and reasonable given BMC's quality of services and expertise.

131.    The Debtor seeks authority for BMC to serve the notice of commencement of the bankruptcy case (the "<u>Case Commencement Notice</u>") and the bar date notice (once entered) upon all of the Debtor's creditors.

132.    The Debtor is in a highly competitive industry, and the Debtor's list of customers is a significant asset of the business.  The Debtor has significant concerns that, if the Bankruptcy Court were to serve the Case Commencement Notice upon the entire list of parties to be served, it would file a certificate of service that would identify all parties served.  Even putting aside the rights of privacy of those customers not to be identified, that list would become public.  Publication of the identity of any the Debtor's customers would cause the Debtor to suffer immediate and irreparable harm.

133.    Rather than accept the risk that the Court is able to parse through the names and addresses to be served with the Case Commencement Notice and publish only those names of creditors on the matrix, the Debtor is willing and able to pay the modest cost for BMC to serve the universe of parties to be served with the Case Commencement Notice.

134.    In the ordinary course of business, the Debtor's primary, if not only, method of communication with its customers is strictly through email.  If the Debtor were to provide actual notice by mail of pleadings and hearings to all the customers, the costs could be astronomical. Given the excessive costs of mailing notices to all of the customers, I believe the procedures set forth in the Noticing Motion are the best and the most practical method of serving the Debtor's customers.

135.    In addition, the Debtor seeks authority to file its list of customers under seal and to maintain such information under seal for filed claims and the Debtor's bankruptcy schedules.

136.    If the Debtor were to publish the names and contact information for its customers, competitors may use this to their advantage.  More importantly, other unscrupulous operators might use this list to harass the Debtor's customers with unwanted solicitations for goods or services.  Consumer privacy laws may be in jeopardy by publishing the names or address of consumer creditors.  As such, the Debtor requests authority to file its customer information under seal (including any certificates of service relating thereto, the Debtor's schedules, and access to proofs of claim filed by the Debtor's customers).

**The Insurance Motion**

137.    In the ordinary course of the Debtor's business, the Debtor maintains numerous insurance policies providing coverage for, *inter alia*: general liability, property, auto, umbrella, workers compensation, and employment practices liability set forth in Exhibit A to the Insurance Motion (collectively, the "Insurance Policies").  By this Motion, the Debtor seeks authority to assume all of its insurance policies with Federal Insurance Company ("FIC") and Associated Industries Insurance ("ANV") (the "Insurance Carriers").  The Insurance Policies protect the Debtor from various losses incurred in the ordinary course of business.

138.    The Debtor is required to pay, through its insurance companies, premiums for coverage under the Insurance Policies (the "Insurance Premiums").  The Insurance Premiums are based upon a fixed rate established and billed by the Insurance Carriers.  The Debtor pays total annual Insurance Premiums of approximately $124,335.

139.    The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its Insurance Policies on an ongoing and uninterrupted basis. The nonpayment of any Insurance Premiums or related fees under the Insurance Policies could result in the Insurance Carrier terminating the existing policies, declining to renew their Insurance Policies, or refusing to enter into new insurance agreements with the Debtor in the future.

140.    In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtor's estate by financing the Insurance Premiums, I believe it is in the best interests of its estate to authorize the Debtor to enter into new insurance premium financing arrangements in the ordinary course of business.

141.    The Debtor submits that payment of obligations due or arising under or related to the Insurance Policies will be paid in the ordinary course of business and in accordance with the terms of the Insurance Policies and in a manner consistent with prepetition practices.

**The Tax Motion**

142.    In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including sales, use, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").    The Debtor pays such Taxes and Fees to federal, state, and local taxing and other governmental authorities and/or municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of its business and the sale of gold and other precious metals, or through shipments of products purchased through the Debtor's websites to customers. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.    As of the Petition Date, the Debtor estimates that it owes approximately $25,000.00 in unpaid Taxes and Fees, sales taxes in particular, which consists of current tax obligations, and not any past due or "catch-up" payments.

143.    The Debtor collects and remits sales, use and related taxes ("Sales and Use Taxes") to the Taxing Authorities in all fifty (50) states.    The Debtor's liability for Sales and Use Taxes is incurred daily.    In general, the Debtor remits such collections to the applicable Taxing Authorities when they become due.    The Debtor estimates that as of the Petition Date it owes approximately $25,000.00 in unremitted sales taxes for the month. In addition, while the Debtor does not presently have any ongoing sales tax audits pending, through this Motion, the Debtor requests authority to pay any amounts determined to be owed on any audits that may be commenced after the Petition Date.    The Sales and Use Taxes collected by the Debtor is collected in trust for the benefit of

33

certain taxing authorities and not property of the estate while other states the Debtor owes the collection of such taxes for the benefit of such taxing authorities.

144.    The Debtor does not anticipate owing any other Taxes and Fees on the Petition Date other than the sales taxes discussed above.  Out of an abundance of caution, however, the Debtor requests authority to pay any Taxes and Fees that are owed up to the amount of $35,000.00.

145.    Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's business operations and restructuring efforts.  Specifically, the Debtor's failure to remit the Prepetition Tax Obligations could adversely affect the Debtor's remaining business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of its estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions; and (d) certain directors, officers and employees might be subject to personal liability -- even if such a failure to remit such Prepetition Tax Obligations was not a result of malfeasance on their part -- which would undoubtedly distract these key employees from their duties related to the Debtor's restructuring.

146.    The Debtor submits that authorizing the payment of the Prepetition Tax Obligations is in the best interests of its creditors and estate because substantially all of the Prepetition Tax Obligations likely constitute priority claims under section 507(a)(8) of the Bankruptcy Code that will be paid in full in the Case.  Accordingly, the proposed relief will only affect the timing of the payment of the Prepetition Tax Obligations and not whether such amounts will be paid.

147.    Further, the failure to pay certain of the Prepetition Tax Obligations may adversely affect the Debtor's ability to maintain its good standing to operate in the jurisdictions in which it does business, to conduct business in those jurisdictions, and to administer its estate for the benefit of its creditors.

148.    As such, and for the reasons stated in more detail in the Tax Motion, it is my understanding and belief that payment of the Prepetition Tax Obligations is in the best interest of the Debtor and its estate, will not harm unsecured creditors and other parties in interest, and will reduce harm and administrative expense to the Debtor's estate.

**F.    CONCLUSION**

149.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  March 2, 2022
Los Angeles, CA

/s/ *John Ohanesian*
John Ohanesian
President and Chief Executive Officer

13480472/1