**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEAR CAPITAL, INC., | ) Case No. 22-10165-BLS |
| | ) |
| Debtor. | ) |
| | ) |

## MOTION TO DISMISS BANKRUPTCY CASE
### FILED BY THE ALABAMA SECURITIES COMMISSION; ARKANSAS SECURITIES COMMISSION; STATE OF ARIZONA EX REL. ARIZONA CORPORATION COMMISSION; CALIFORNIA COMMISSIONER OF FINANCIAL PROTECTION AND INNOVATION; COLORADO SECURITIES COMMISSIONER; DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES AND BANKING COMMISSIONER; DELAWARE DEPARTMENT OF JUSTICE, INVESTOR PROTECTION UNIT; HAWAII OFFICE OF THE ATTORNEY GENERAL; IDAHO DEPARTMENT OF FINANCE; KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, DIVISION OF SECURITIES; LOUISIANA OFFICE OF FINANCIAL INSTITUTIONS; MICHIGAN DEPARTMENT OF ATTORNEY GENERAL; MAINE SECURITIES ADMINISTRATOR; STATE OF MARYLAND EX REL. MARYLAND SECURITIES COMMISSIONER; MISSOURI SECURITIES ENFORCEMENT COUNSEL; MONTANA COMMISSIONER OF SECURITIES & INSURANCE; NEW HAMPSHIRE BUREAU OF SECURITIES REGULATION; OHIO DEPARTMENT OF COMMERCE, DIVISION OF SECURITIES; PUERTO RICO OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS; SOUTH CAROLINA OFFICE OF THE ATTORNEY GENERAL; STATE OF TENNESSEE; TEXAS STATE SECURITIES BOARD; UTAH SECURITIES DIVISION; VERMONT DEPARTMENT OF FINANCIAL REGULATION; WASHINGTON DEPARTMENT OF FINANCIAL INSTITUTIONS, SECURITIES DIVISION; AND THE STATE OF WISCONSIN DEPARTMENT OF FINANCIAL INSTITUTIONS

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE**:

COMES NOW the Filing States,[1] and file the following *Motion to Dismiss Bankruptcy Case* pursuant to 11 U.S.C. § 1112(b)[2] and state as follows:

## I.    <u>OVERVIEW</u>

Lear's[3] bankruptcy filing does not serve a valid bankruptcy purpose and was filed to obtain a tactical litigation advantage against state governmental entities that have been coordinating investigations into Lear's actions over the last two years. Lear does not actually need any operational relief at this time; indeed, it admits it can pay its debts as they come due and has, in fact, taken unusual steps to satisfy virtually all pending claims against it prior to filing this case. It did so because it is simultaneously attempting to use this bankruptcy as a litigation tactic to force the investigations by multiple state securities regulators into a single forum of its choice, while also attempting to artificially make itself eligible to proceed as a Subchapter V small business debtor. These two goals are mutually exclusive: either the scope and volume of the litigation against this Debtor is so immense that it needs assistance from the bankruptcy system, or it has no

---

[1] Those States consist of: Alabama Securities Commission ("State of Alabama"), Arkansas Securities Commission ("State of Arkansas"), State of Arizona ex rel. Arizona Corporation Commission ("State of Arizona"), California Commissioner of Financial Protection and Innovation ("State of California"), Colorado Securities Commissioner ("State of Colorado"), District of Columbia Department of Insurance, Securities and Banking Commissioner ("District of Columbia"), Delaware Department of Justice, Investor Protection Unit ("State of Delaware"), Hawaii Office of the Attorney General ("State of Hawaii"), Idaho Department of Finance ("State of Idaho"), Kentucky Department of Financial Institutions, Division of Securities ("State of Kentucky"), Louisiana Office of Financial Institutions ("State of Louisiana"), Michigan Department of Attorney General ("State of Michigan"), Maine Securities Administrator ("State of Maine"), State of Maryland ex rel. Maryland Securities Commissioner ("State of Maryland"), Missouri Securities Enforcement Counsel ("State of Missouri"), Montana Commissioner of Securities & Insurance ("State of Montana"), New Hampshire Bureau of Securities Regulation ("State of New Hampshire"), Ohio Department of Commerce, Division of Securities ("State of Ohio"), Puerto Rico Office of the Commissioner of Financial Institutions ("Territory of Puerto Rico"), South Carolina Office of the Attorney General ("State of South Carolina"), State of Tennessee ("State of Tennessee"), Texas State Securities Board ("State of Texas"), Utah Securities Division ("State of Utah"), Vermont Department of Financial Regulation ("State of Vermont"), Washington Department of Financial Institutions, Securities Division ("State of Washington"), and the State of Wisconsin Department of Financial Institutions ("State of Wisconsin").

[2] Hereafter, references to Bankruptcy Code sections will be in the form of "Section 1112(b)(1)."

[3] Lear Capital, Inc. will be referred to as "Debtor" or "Lear."

debts at all (as it asserts in its schedules) and has no need of that aid. Lear cannot have it both ways, and, as shown below, it has no current need for bankruptcy relief. As a result, its bankruptcy case should be dismissed for cause until such time as Lear *actually* needs such assistance. Alternatively, this Court should abstain from hearing the case pursuant to Section 305(a). [4]

## II.    BACKGROUND FACTS

On March 2, 2022, Lear filed a highly unusual petition under Subchapter V of Chapter 11. Lear is a financially healthy company – so healthy that it listed *zero* creditors on the Top 20 list of its petition. (Official Form 204, Docket No. 1, p. 9).[5] While following the initial Section 341 meeting, it appears that Lear may be required to re-file its schedules with some minimal debts listed and to list some bonuses contractually owed to insiders, these are relatively small inconsistencies. The reality is, as Lear's schedules indicate and as it admitted at the Section 341 meeting, it is current on its bills and it is fully capable of paying them as they come due. (Audio Tape 1, Time 2:36:00 to 2:36:25 *attached as* <u>Exhibit 1</u>).[6]

In fact, Lear's financial footing is so solid that it settled many of its obligations in lump sum payments and prepaid others in the months prior to filing its petition in an obvious attempt to bring it under the threshold for a Subchapter V bankruptcy. These lump sum payments include settlements with the New York Attorney General and the City of Los Angeles in which it agreed to pay, in full, and without delay, a combined total of $8.75 million. (Ohanesian Declaration, Dkt.

---

[4] Even if the filing here were made in good faith, the investigating states have serious questions about the *bona fides* of the Subchapter V election. Following the ultimate completion of the Section 341 meeting, the states will consider whether objections to that election will be filed. Of course, the necessity for such a filing becomes moot should this Court grant either dismissal or abstention, as requested herein.

[5] Citations to the docket hereafter will be in the form of "Dkt. No. 1-9."

[6] The Filing States intend to have the recorded audio tapes transcribed into written form. Unfortunately, there were some delays in receiving the recordings so the transcription was not complete in time for the filing. The Filing States will submit a revised form of this motion with the page numbers as soon as the transcription is complete. The audio tapes will be served to all parties on the service list via U.S. mail.

No. 15-6-7, par. 29-34; Dkt. No. 90-36-37 (*see* nos. 3-50, 54, 62, reflecting payments made on Dec. 31, 2021 to City of Los Angeles and various trusts for the New York settlement); Audio Tape 2, Time 25:57 to 30:12 *attached as* <u>Exhibit 2</u>).[7] In addition, Lear paid $700,000 in a lump sum to settle amounts owed to the California Franchise Tax Board. (Dkt. No. 90-29, no. 3-54). Lear also paid several settlements owed to its customers in an unspecified amount. (Dkt. No. 89-30; Dkt. No. 90-48; Audio Tape 1, Time 57:20 to 59:00; 2:09:45 to 2:11:30).

On the operational side, it paid out $4.45 million to its owner Kevin Demeritt in shareholder S Corp distributions over the course of 2021, with the last payment of $3.3 million being made in December 2021. (Dkt. No. 90-46). Those payments are labeled as being for taxes but they seem quite high in that they represent 73 percent of the net income of $6,132,781 earned by Lear that year. (Dkt. No. 15-3, par. 12). Lear also stated that it prepaid $3.5 million in bonuses in December that were normally paid in January (Dkt. No. 15-22, par. 93), as well as paying commissions of about $1 million on March 1st (prior to the petition date) that would normally not have been paid until the 4th to the 7th of the month (postpetition). (Dkt. 15-17-18, par. 72 and 76). Finally, the debtor paid captive insurers $884,000 during the preference period. (Dkt. No. 89-20 characterizes certain insurers as "captive insurance;" Dkt. No. 90-25-26, Nos. 3.8 and 3.22 lists payments to them totaling that amount).

Thus, rather than filing bankruptcy because it was having difficulty in paying its bills, Lear merely states in Mr. Ohanesian's declaration (Dkt. No. 15-7, par. 35) that there may be "potential" claims that "might" be formalized at some future date, so it filed bankruptcy now "to address all potential claims in one forum ... [as] the best and most efficient way to resolve any and all potential claims." The Debtor provided no further information on the expected size of those claims, the costs

---

[7] The Ohanesian Declaration will be cited hereafter simply by Dkt. No. 15.

incurred in resolving them, the timing of expected payments or the like. In a statement to the press, Mr. Ohanesian clarified that the goal was "to achieve comprehensive resolution of potential government claims while still operating an otherwise financially strong business." (Jeremy Hill, *Gold Coin Seller Lear Files for Bankruptcy Amid Legal Scrutiny*, BLOOMBERG, Mar. 2, 2022, *attached as* <u>Exhibit 3</u>). This Court clarified for itself at the first day hearing that the company was not looking to carry out any form of operational restructuring or rehabilitation. And, at the Section 341 meeting, after Mr. Ohanesian stated that the Debtor could pay its bills as they came due, he twice confirmed that the pending governmental regulatory matters were the reason for the filing and cited no other basis for doing so. (Audio Tape 1, Time 2:34:45 to 2:35:20; 2:38:00 to 2:38:50).[8] Indeed, he actually denied that the filing was due to any "debts" owed to the governmental entities and referred merely to the investigations themselves. *Id.*

Those investigations are primarily being conducted by state securities regulators. Lear also acknowledges being subpoenaed by the Commodity Futures Trading Commission ("CFTC"), but it states that it fulfilled those requests a year ago and has heard nothing further. (Dkt. No. 90-48, No. 7.6). There are currently 29 state regulators (the "Investigating State Securities Regulators" or "ISSRs") that have been conducting coordinated investigations of Lear, its principal Kevin DeMeritt, and other associated individuals or entities (collectively the "Lear Investigations") for possible state law violations. (Brauer Decl., p. 2, par. 8, *attached as* <u>Exhibit 4</u>). The ISSRs are tasked with administering their respective state securities statutes and regulations promulgated thereunder. For example, the Maryland Securities Division ("MSD") administers the Maryland Securities Act, Md. Code, Corps & Assn's § 11-101 *et seq.* ("Maryland Securities Act") and may conduct investigations to determine whether any person has violated or is about to violate any

---

[8] The sound quality of the witness's answers is not the best in these two segments, but it is clear enough that he is referring to the governmental investigations as being the reason the bankruptcy was filed.

provision of the of the Maryland Securities Act. *See* Maryland Securities Act § 11-701. (Brauer Decl., p. 1, par. 3 and 4). Maryland's Lear Investigation is concentrated currently on determining if there have been any violations of the antifraud and registration provisions of the Maryland Securities Act. *See* Maryland Securities Act §§ 11-301, 11-302, 11-401, 11-402. (Brauer Decl., p. 2, par. 5). Other state regulators have similar investigatory authority and are conducting similar Lear Investigations. (Brauer Decl., p. 2, par. 6). In addition to the ISSRs, 15 other states have entered into tolling agreements with Lear (Brauer Decl., p. 4, par. 9).

The Lear Investigations began in early 2020, and the ISSRs have been coordinating since then under the leadership of the MSD to maximize efficiency for both the ISSRs and for Lear. (Brauer Decl., p. 5, par. 10). The ISSRs have coordinated document production from Lear pursuant to a *subpoena duces tecum* (SDT) issued by the California Department of Financial Protection and Innovation ("DFPI") (formerly the Department of Business Oversight or "DBO") on April 14, 2020. The ISSRs and Lear intended for the SDT to be a comprehensive request for documents from Lear with the responses shared among the ISSRs. That coordination maximized efficiency for all parties so that the ISSRs need not compete with each other to get their regulatory requests answered timely, and Lear was able to produce documents once rather than responding to 29 competing regulatory requests. (Brauer Decl., p. 5, pars. 12, 13).

DFPI, MSD, and Lear ultimately negotiated a rolling production of documents to the ISSRs and Lear has made approximately 13 productions to date and generally has complied with the SDT. Correspondence between the Maryland Securities Division and DFPI with Lear's counsel in furtherance of the Lear Investigations has included approximately 14 phone calls, 6 letters, and 80 emails with Lear's counsel. (Brauer Decl., p. 6, pars. 14, 15). Throughout the course of the Lear Investigations, a limited number of the ISSRs have also sent subpoenas regarding matters specific

to their Lear Investigations. The total volume of additional subpoenas has been far smaller than if there had been no coordination by the ISSRs on their joint subpoena. (Brauer Decl., p. 6, pars. 16 and 17). In addition, ISSRs were able to listen to depositions of Lear personnel taken by the CFTC during its investigation which again reduced time and costs for Lear, even if some additional depositions may eventually be needed. (Brauer Decl., p. 6, par. 16).

The value of that coordination is shown in Lear's own schedules in this bankruptcy. Even while it was dealing with the ISSRs and finalizing the two settlements with the City of Los Angeles and the State of New York noted above, it lists only $260,000 in payments for nonbankruptcy related legal fees in the three months prior to the bankruptcy filing with $125,000 being held for retainers. (Dkt. No. 90-33, 36, Nos. 3.20, 3.48; Dkt. No. 89-20). By contrast, it actually paid *$999,000* – nearly four times as much – in professional expenses related to the bankruptcy during that same period (Dkt. No. 90-36, 37, Nos. 3.49, 3.56, and 3.61; Dkt. No. 30-50).[9] It also set aside $394,000 more in retainers for those bankruptcy firms. (Dkt. 89-20) Since the earliest such payment was made on December 7, 2021, it is clear that the Debtor had been preparing for a bankruptcy well before it filed – and before it even completed its settlements with Los Angeles and New York at the end of that month. Those figures plainly indicate that Lear's decision to try to bring the investigations to a head by forcing them into its chosen forum had more to do with looking for a litigation advantage in bankruptcy court than the need to cope with the relatively minimal costs of the Lear Investigations.

That is particularly true since at the moment, the ISSRs are still in the process of conducting investigations. None of the ISSRs (or the states with tolling agreements) have filed any formal

---

[9] The latter document is intended to cover all such payments within the year prior to the filing. In fact, though, all the payments actually occurred within the 90 days prior to the petition date so the two numbers are fully comparable.

administrative or other action to date against any of the parties that are the subject of the Lear Investigations. (Brauer Decl., p. 5, par.11). However, by way of its preemptive filing, Lear plainly hopes to use the Subchapter V election to artificially limit the remedies that the states and other creditors may obtain in this bankruptcy, to avoid the need to obtain support from any class of creditors to confirm a plan, and to discharge some or all of its liabilities. *See* Section 1191. And this is wholly apart from its ability to use any of the other procedural and substantive protections of bankruptcy to its benefit while attempting to limit the activities of the regulators.[10] As the Filing States show below, the courts, including specifically the Third Circuit, have repeatedly analyzed whether filings seeking such tactical advantages are allowed under the Code and have repeatedly held that they are not.

### III.    AUTHORITIES & ARGUMENT

**A.    Chapter 11 Petitions Not Filed In Good Faith Are Subject To Dismissal For Cause Under 11 U.S.C. Section 1112(b).**

"A debtor who attempts to garner shelter under the Bankruptcy Code . . . must act in conformity with the Code's underlying principles," and "a good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons ... available only to those debtors and creditors with 'clean hands.'" *In re SGL Carbon Corp.*, 200 F.3d 154, 161-62 (3d Cir. 1999). "The court's ability to impose [a] good faith requirement is 'indispensable

---

[10] Certainly, there are many regulatory powers the ISSRs can assert that are not part of the bankruptcy court's normal range of authority. The Maryland Securities Act, for instance, allows the Securities Commissioner to issue summary cease and desist orders, censure registrants, bar violators from engaging in business in Maryland, and issue civil penalties. Maryland Securities Act § 11-701.1. The Commissioner may also seek a temporary restraining order, temporary or permanent injunction, civil penalties, a declaratory judgment, the appointment of a receiver or conservator for the defendant or the defendant's assets, a freeze of the defendant's assets, rescission, restitution, disgorgement, payment of prejudgment and postjudgment interest, and any other relief a court deems just. Maryland Securities Act § 11-702. (Brauer Decl. pg. 1, par. 4). The Section 362(b)(4) exception to the automatic stay protects much of this activity but this filing does impose at least some constraints on the Commissioner's actions that would not exist outside of bankruptcy.

to [the] proper accomplishment of the basic purposes of Chapter 11 protection." *Id.* (*citing Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989)).

When the debtor's good faith in its bankruptcy filing is challenged, the debtor has the burden to prove that the Chapter 11 bankruptcy petition was filed in good faith, and a Chapter 11 bankruptcy petition found to be filed in bad faith is subject to dismissal under 11 U.S.C. § 1112(b). *See 15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),* 384 F.3d 108, 118-120 (3rd Cir. 2004).[11]

In deciding whether a petition is filed in bad faith, courts in the Third Circuit make a fact-intensive inquiry into the totality of facts and circumstances. *See 15375 Mem'l Corp.*, 589 F.3d at 618; *Integrated Telecom,* 384 F.3d at 118; and *SGL Carbon,* 200 F.3d at 162. As the Third Circuit explained in *SGL Carbon*, and the later cases, the two relevant questions when analyzing whether a petition was filed in good faith are: a) does the petition serve a valid bankruptcy purpose and b) was the petition filed just to obtain a tactical litigation advantage?

### 1.    Chapter 11 Petitions Lacking a Valid Bankruptcy Purpose Are Not Filed in Good Faith.

For a Chapter 11 bankruptcy petition to be filed in good faith, it must serve a valid reorganizational purpose. *See SGL Carbon,* 200 F.3d at 166*, citing In re Marsch*, 36 F.3d 825, 828-29 (9th Cir. 1994) ("The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a

---

[11] The three cases cited above from the Third Circuit – *SGL Carbon, Integrated Telecom,* and *15375 Mem'l Corp.* -- contain thorough discussions on these issues as illustrated through three different fact patterns that share common traits of cases being filed as a litigation tactic to provide benefits only for the debtor's principals and not for the entire body of creditors. As such, the cases lay out clear guidelines for this Court to apply in considering the tactical filing made by Lear in this case and plainly support dismissal of the instant petition. The analysis in those cases is reviewed and synthesized in the recent decision in *In re LTL Mgmt., LLC*, 2022 Bankr. LEXIS 510 (Bankr. D. N.J. Feb. 25, 2022).

viable state."); *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir.1985); *In re Ironsides, Inc.,* 34 B.R. 337, 339 (Bankr.W.D.Ky.1983) ("[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre....*"). Put another way, the issue the court must review is whether the filing "preserv[es] a going concern" or "maximiz[es] the values of the Debtor's estate." *15375 Mem'l Corp,* 589 F.3d at 619, citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *see also Toibb v. Radloff,* 501 U.S. 157, 163-64 (1991).

Logically, then, a Chapter 11 filing is normally not justified for a financially healthy company because there is generally no *bankruptcy* purpose to be accomplished when an entity that is fully capable of paying its bills in due course files a petition instead. Bankruptcy inherently imposes many operational constraints and added costs and burdens that no rational entity would incur if it can avoid doing so. That is undoubtedly the reason why the Code strictly limits when creditors can force a debtor into an involuntary bankruptcy and allows them to be sanctioned if the petition does not succeed. *See* Section 303. Conversely, the growing phenomenon of debtors doing the so-called "Texas Two-Step" (relegating all of their liabilities to a single entity that then files bankruptcy while the rest of the corporate enterprise continues to operate outside those constraints) is further proof of the extent to which healthy corporations will go to avoid being subject to the restrictions imposed under a bankruptcy filing. Their intense interest in avoiding having bankruptcy intrude on their operations is even more striking when those non-debtor entities solemnly pledge that they will make available the same financial resources to resolve those liabilities as if they had also filed bankruptcy themselves. *See, e.g., In re LTL Mgmt., LLC,* 2022 Bankr. LEXIS 510 at **10, 12, 15-16 (Bankr. D. N.J. Feb. 25, 2022).

Indeed, even a company that does have significant debts may still be found to have filed in bad faith if it cannot identify how taking that drastic step will add to or preserve value for the estate that would not otherwise be available to creditors outside bankruptcy. In *15375 Mem'l Corp.*, 589 F.3d at 620-25, for instance, the Third Circuit rejected all of the debtor's proffered justifications for its filing in that they were all benefits that could equally have been obtained outside bankruptcy. It concluded that the petition was filed in bad faith because the only logical reason a debtor would have chosen to incur the added costs and burdens of bankruptcy would be to obtain an unfair tactical advantage over its creditors. Thus, when a company that is fully capable of meeting its obligations does choose to file bankruptcy and incur those additional – and unnecessary – costs and burdens, there is a strong logical presumption that it is doing so to obtain an unfair tactical advantage over those with whom it has disputes.

While there may be unique factors that can justify a filing by a debtor that seems to be able to satisfy its debts as they come due, such cases are unusual. An extraordinarily large judgment might show a need for temporary bankruptcy relief even if the debtor is otherwise capable of paying its bills, as occurred with Texaco, which faced a $12 billion judgment that exceeded its capacity to obtain appeal bond funding. *In re Texaco, Inc.*, 76 B.R. 322, 324-25 (Bankr. S.D. N.Y. 1987). Absent such unusual facts, however, when a financially stable debtor seeks to utilize bankruptcy, it is not just trying to maintain the *status quo ante*. Rather, it is trying to gain advantages over its creditors that the Code does not contemplate or sanction.

Such actions are the quintessential form of bad faith filing. *See 15375 Mem'l Corp.*, 589 F.3d at 625: "[F]iling a Chapter 11 petition merely to obtain tactical litigation advantages is not within the legitimate scope of the bankruptcy laws," *citing SGL Carbon*, 200 F.3d at 165; *see also United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.* (*In re Timbers of Inwood Forest*

*Assocs., Ltd.*), 808 F.2d 363, 373 (5th Cir.1987) (en banc), *aff'd*, 484 U.S. 365 (1988) (if Chapter 11 plan does not have a rehabilitative purpose, the "statutory provisions designed to accomplish the reorganizational objectives become destructive of the legitimate rights and interests of creditors"); *In re Little Creek Dev. Co.,* 779 F.2d 1068, 1072 (5th Cir. 1986) (explaining that benefits of Chapter 11 should only be given to debtors with "clean hands"); *Furness v. Lilienfield*, 35 B.R. 1006, 1009 (D. Md. 1983) ("Chapter 11 was designed to give those teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liabilities."); 7 *Collier on Bankruptcy* at 1112–22 (dismissal is appropriate when costs of Chapter 11 are not justified).

Accordingly, courts regularly dismiss bankruptcy cases filed by financially healthy companies that have no need to avail themselves of the protections of a Chapter 11 bankruptcy as being brought for an improper purpose. *See, e.g., Marsch*, 36 F.3d at 828–29; *Argus Group 1700 v. Steinman*, 206 B.R. 757, 765–66 (E.D. Pa. 1997) (noting numerous factors that indicated debtors were operating without serious financial stress when they filed their case but simply preferred to have bankruptcy court resolve the pending litigation); *Furness, supra*, 35 B.R. at 1011–13 (courts look to whether debtor is in financial distress noting that, "There must be real debt and real creditors; otherwise the basic purposes of Chapter 11 would be thwarted."); *In re Talladega Steaks, Inc.*, 50 B.R. 42, 44 (Bankr. N.D. Ala. 1985) (where motivation for bankruptcy "was other than to seek the reorganization of a financially-distressed business[, the] interests of creditors and the debtor will be best served by abstention by the Court and dismissal of the case."). A debtor need not wait until it is in the last throes of its operational survival, but that does not open the door to premature filing where there are no current reorganizational needs. *See, e.g., In re Coastal Cable*

*T.V., Inc.,* 709 F.2d 762, 764 (1st Cir. 1983) ("One [basic bankruptcy] principle is that a person in bankruptcy, while not necessarily insolvent, *see* 11 U.S.C. § 109, must at least owe debts.").

In sum, the fact that a company is financially healthy, thriving, and paying its bills on time is itself perhaps the strongest evidence of bad faith, and that the bankruptcy is tactically motivated, because it is clear that no one would choose to incur the burdens of a bankruptcy lightly or without a view to achieving some major benefits that are unavailable outside of bankruptcy.

## 2. Chapter 11 Petitions Are Not Filed In Good Faith if the Timing of the Petition Indicates the Intent to Obtain a Tactical Litigation Advantage.

When making a good-faith determination, courts must also consider whether the timing itself of the bankruptcy filing is further evidence that it was filed to obtain an advantage in litigation. From the earliest days of the Code, it has been held that "[t]he Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation." *Furness, supra,* 35 B.R. at 1013. Another court held that bankruptcy filing as a forum-shifting technique is bad faith, noting that, "[a]s a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *In re HBA East, Inc.*, 87 B.R. 248, 259–60 (Bankr. E.D. N.Y. 1988).

As recognized by the Third Circuit Court of Appeals in *In re SGL Carbon Corp*, 200 F.3d at 164, "the mere possibility of a future need to file, without more, does not establish that a petition was filed in 'good faith.'" The debtor there was financially healthy and able to pay its bills as they came due but was involved in litigation that could possibly end in a very large judgment. The unsecured creditors committee moved to dismiss the bankruptcy as being filed in bad faith, and

13

the Third Circuit agreed that, although SGL might eventually need such relief, it did not need it

then, and the filing was simply intended to gain a tactical advantage in that litigation. *Id.* at 164.

To be sure, not every attempt by a currently solvent entity to use bankruptcy to "orchestrate" a central forum for resolving multiple pending cases will be held to be in bad faith. *LTL, supra,* 2022 Bankr. LEXIS 510, is an example where the court found legitimate reasons for such a filing. Although there were some highly controversial maneuvers (including reliance on the Texas Two-Step) used to create the single debtor that filed the case, the court found that, on balance, there were adequate factors supporting the overall good faith in the filing. It noted the existence of 40,000 cases pending against the debtor; the likelihood that thousands more would be filed annually for decades to come creating tens of billions of dollars more in direct liabilities; and the potential for additional indemnity obligations of between $25 to $118 billion. These substantive liabilities were in addition to the enormous litigation expense that inevitably would be incurred in handling that multitude of unrelated cases. At the same time, the non-filing parent, Johnson & Johnson, had taken significant steps to fund a trust mechanism for those claims that would be of the same magnitude that it might have needed to implement outside of bankruptcy. Taking all of that into consideration and keeping in mind that there was a well-defined statutorily prescribed mechanism in Section 524(g) of the Code for using such a trust to handle exactly those types of claims, the court concluded that the debtor could justifiably argue that Congress had anticipated and agreed to the use of such a centralized method of proceeding. Thus, it stated, it held "a strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case—ensuring a meaningful, timely, and equitable recovery." *LTL,* 2022 Bankr. LEXIS 510 at **26-27.

3.        **Chapter 11 Debtors Lack Good Faith When They Seek a Tactical Litigation Advantage to Thwart State Police and Regulatory Authority.**

If *LTL* is at one end of the spectrum of good faith, the case-at-bar is plainly on the opposite end of that spectrum. A debtor that uses a statutorily-created method of resolving its liabilities is acting in accordance with the Code's principles and not in bad faith. On the other hand, where a filing flouts the protections of the Code and the jurisdictional provisions in Title 28 of the U.S. Code, the same cannot be said. A filing whose entire goal is to control and redirect anticipated police and regulatory litigation into this Court directly conflicts with protections that Congress has enacted for such litigation and, as such, sounds in bad faith and further warrants dismissal.

In that regard, it is clear that "a bankruptcy case filed for the purpose of avoiding a regulatory scheme is not filed in good faith and should be dismissed." *See In re NRA of Amer.*, 682 B.R. 262, 277-78, 280-82 (Bankr. N.D. Tex. 2021). The court dismissed the NRA's case which it had concededly filed in response to regulatory actions by the New York Attorney General seeking its dissolution. The debtor had no financial need to file bankruptcy but saw filing its case as a way to obtain a "fair, level playing field." The court concluded that using bankruptcy to take that remedy off the table was an attempt to obtain an unfair litigation advantage and warranted dismissal.[12]  *See also Sunshine Grp., LLC v. City of Dana Point (In re Sunshine Grp., LLC),* 2020 Bankr. LEXIS 1000 at **20-23 (9th Cir. BAP April 10, 2020) (filing bankruptcy as a way to avoid state court rulings on scope of receivership to abate health and safety issues was abusive litigation tactics); *In re Forest Hill Funeral Home & Mem'l Park-East, LLC*, 364 B.R. 808, 822-23 (Bankr.

---

[12] The lack of necessity for the bankruptcy filing was underscored in the recent decision in *People v. Nat'l Rifle Ass'n of Am., Inc.,* 2022 N.Y. Misc. LEXIS 749 at **2-3 (Sup. Ct. N.Y. March 2, 2022). In that case, the Attorney General's action was heard on the merits in state court after being returned from Texas, and the trial court dismissed the allegation seeking to dissolve the NRA on the basis that the alleged misconduct by the officers primarily harmed the organization and its members rather than the public as a whole. Thus, even while retaining numerous counts dealing with misconduct, the court did separate out the count posing an "existential threat" to the debtor's existence and granted the NRA the relief it sought.

E.D. Okla. 2007) (finding cause for dismissal under section 1112(b) because the case was not filed in good faith for several reasons, including that it was filed to evade the regulatory authority of Tennessee); *In re First Plus Fin. Enters., Inc.*, 99 B.R. 751, 755-56 (Bankr. W.D. Tex. 1989) (case dismissed where "the obvious purpose in this case is to use the Chapter 11 filing as a litigation strategy and leverage in order to defeat the Texas regulatory scheme for the receivership and conservatorship of insolvent life insurance companies").

In addition to the general considerations of "good faith" with respect to the petition filing noted above, several statutory provisions make explicitly clear that Congress intends to allow police and regulatory authorities to exercise their statutory obligations unhampered by bankruptcy proceedings to the greatest extent possible while still allowing the reorganizational goals of the Code to be protected. Those include Section 362(b)(4) which excepts from the automatic stay:

> the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

That current language is itself a 1994 expansion of the original language that initially only excepted such actions from the protections in Section 362(a)(1) and (2). Section 362(b)(1) provides even broader protection for criminal actions against a debtor. As a result, while a case is pending, a governmental unit is authorized to continue all of its investigatory and enforcement activities up to and including obtaining and enforcing a final judgment, with the sole exception being that the government may not enforce a monetary judgment outside the overall process of the allocation of the estate. *See Halo Wireless, Inc. v. Alenco Commc'ns Inc.* (*In re Halo Wireless, Inc.*), 684 F.3d 581, 587-88 (5th Cir. 2012) (Section 362(b)(4) discourages debtors from submitting bankruptcy

petitions to attempt to evade governmental efforts to enjoin or deter debtor conduct that would threaten the public safety and welfare).[13]

In addition to that protection in the Code, Title 28 of the U.S. Code, Section 959(b) requires a debtor in possession to "manage and operate" its property "according to the valid requirements of the valid laws of the State . . . in the same manner that the owner or possessor would be bound to do." Finally, Section 1452(a) allows for the removal of any cause of action to the bankruptcy court *except* for a Tax Court action or a "civil action by a governmental unit to enforce such governmental unit's police or regulatory power."

Those jurisdictional provisions underscore that not only is the government free to continue its police and regulatory actions, despite the bankruptcy filing, but it is also entitled to continue those actions in its designated forum and subject to its own procedural mechanisms. Accordingly, a debtor is *not* expected to be allowed to force such matters into the bankruptcy forum, even if it might prefer that environment. Unlike the situation in *LTL* where Congress had deliberately established a mechanism for centralized resolution of the types of claims at issue there, it has done exactly the opposite here by enacting an interlocking set of provisions to protect governmental regulatory activities.[14] As a result, when a debtor seeks to use bankruptcy to interfere with those

---

[13] Moreover, under Section 1141(d)(6), if that police and regulatory action deals with a fraud debt owed to the government, even a corporation may not discharge it. Under Section 1192, however, a Subchapter V debtor may be entitled to a broader discharge which is likely another advantage the Debtor is seeking to obtain by electing that Subchapter. As noted above, the states have reserved their rights to argue as to whether this Debtor qualifies for that treatment – but if it does so qualify only by manipulation of its debts and the timing of its petition, that is a further reason to find the case was not filed for a valid purpose.

[14] To be sure, there are certain "use or lose" aspects of a bankruptcy proceeding, that may put the government to the choice of entering that arena or losing its rights to recover, such as the need to file a claim to recover from estate assets or to file a discharge complaint in order to except debts falling under Section 523(a)(2), (4), or (6) from discharge. Even in those scenarios, though, there is a plethora of case law regarding how and when nonbankruptcy determinations on the same issues are given collateral estoppel effect. Moreover, Section 502(b)(9) specifically gives governmental entities a longer time than other creditors (a minimum of 180 days) to file a proof of claim, making it more likely they can complete their investigations before the bar date. While Section 105(a) has occasionally been used to enjoin police and regulatory actions that are excepted from the stay, the courts have cautioned that it must be used with care

protections and demands the right to force the government into that centralized forum on the debtor's own timetable, it is not acting in accordance with the goals and policies that Congress has created; it is acting in direct defiance of them.

**B.      Lear's Petition Was Not Filed in Good Faith and Should Be Dismissed**.

In some cases, there may be conflicting evidence as to whether a debtor's actions and motives fall under either or both of the criteria for establishing a bad-faith filing – but that is not the case here. To the contrary, Lear's statements and schedules unequivocally admit to both aspects of the analysis under *SGL* and the other cases cited above; i.e., that Lear's petition served no legitimate bankruptcy purpose in light of its financial stability, and that it was filed solely to gain a tactical advantage over the Filing States by seeking to force them into the bankruptcy arena. As such, this petition satisfies the requirements to show that Lear's filing was not made in good faith. And, here, there are other factors, such as filing bankruptcy prematurely to attempt to artificially qualify for the Subchapter V election that further underscore the lack of good faith in this filing so that, taken together, there are ample ground to justify dismissing this case.

**1.      Lear Is in No Current Financial Distress**.

As set out in the Background Facts, Lear has fully conceded that it is not in need of financial relief from a bankruptcy filing at this time. It stated at the Section 341 meeting that it was able to pay its bills as they came due and, indeed, as noted in the Background Facts, paid out in the neighborhood of $15 million in the months just prior to the case, including making early payments on a number of bills. It failed to list *anyone* on its list of 20 largest creditors and scheduled

---

and applied as a scalpel, not a sledgehammer. *See, e.g., FERC v. FirstEnergy Sols., Corp. (In re FirstEnergy Sols., Corp.),* 945 F.3d 431, 451-53 (6th Cir. 2019); *Official Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.),* 378 F.3d 511, 523-24 (5th Cir. 2004); *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986) (section does not allow bankruptcy courts to "act as roving commissions to do equity"). None of those provisions detract from the basic concept that Congress intends to protect the right of governmental entities to proceed in their own fora in most circumstances.

essentially no debt. Even if it has to amend those schedules somewhat in response to questioning at the Section 341 meeting, that does not affect the clear admissions by Lear that it was not in need of bankruptcy relief at the present time. As the cases discussed in Section A.1 above make clear, a filing by a financially stable entity is presumptively filed in bad faith because it inherently serves no legitimate bankruptcy purpose. As such, and as further discussed in Section A.2, the effort to obtain a tactical advantage over its creditors is further evidence of bad faith.

> **2.    Filing Bankruptcy to Force State Regulatory Litigation into the Bankruptcy Forum Is an Attempt to Obtain a Tactical Litigation Advantage and Is Not a Valid Purpose for this Case**.

The bad faith shown from the filing by a stable entity is compounded by Lear's admissions that the only reason it filed bankruptcy was the pending Lear Investigations – and the denial that there were even any debts owed with respect thereto (as discussed above in the Background Facts). One can certainly understand that the principals of a party being investigated by various governmental agencies would like to dictate how and when those matters will be heard and resolved by filing bankruptcy at a time and place of its own choosing. But, as the courts have repeatedly made clear, that is not the way the Code works.

To begin with, bankruptcy is simply not an appropriate way to force the Lear Investigations into a single forum over the objections of the Filing States. As noted above, Congress has made clear that these police and regulatory cases cannot be removed to the bankruptcy court, and the automatic stay does not bar governmental entities from proceeding with the investigations and enforcement activities. As a result, as discussed above in Section A.3, the courts have stated emphatically that using bankruptcy as a way to avoid compliance with the government's exercise of its normal police and regulatory powers is improper and an abuse of the system.

Moreover, in this case, the Debtor cannot even argue that such an action would result in any beneficial methodology for resolving the various state investigations. As set forth in the Brauer declaration, and as discussed in the Background Facts, the ISSRs have been jointly investigating the Debtor's activities, making joint discovery requests, and sharing the Debtor's production among themselves. The Debtor has not been subject to multiple case filings or the need to endlessly produce the same materials repeatedly to different parties.[15]

In fact, as noted above, the Debtor's schedules indicate it has recently spent almost four times more on preparing for and filing its bankruptcy petition than it did on all nonbankruptcy related matters during the same period of time ($999,000 versus $260,000 in payments, as well as the need to set aside another $394,000 in bankruptcy retainers). In short, if the Debtor truly seeks to resolve its potential liability with the ISSRs, bankruptcy hardly appears to be the most economical way to do so. Those efforts will need to take place in any event, and there is little reason to assume the cost will be different inside or outside of the bankruptcy system. The real difference is the amount of bankruptcy-related expense that will be added on top thereof and paid out of the Debtor's funds. The analysis in *15375 Mem'l Corp.* is a good example of the fact that merely because something can occur during a bankruptcy case does not establish that it will do so more effectively or more inexpensively than in a nonbankruptcy forum. The same is true here.

### 3. Filing Bankruptcy Prematurely in Order to Artificially Qualify for the Subchapter V Election Is Further Evidence of Bad Faith.

An entity's choice to file bankruptcy prematurely when it is still financially healthy has been treated as evidence of bad faith for all the reasons discussed above in Section A.1. The

---

[15] Nor does it appear from the Debtor's listing of its litigation and settlements that it faced a large number of consumer complaints. The listing at Dkt. No. 90-48 lists eight cases of which some were listed as being negotiated, but at the Section 341 meeting, Mr. Ohanesian indicated that all of the cases had now been resolved. (Audio Tape 1, Time 2:09:45 to 2:11:30).  Clearly, that minimal number of cases were not the driving impetus for the filing.

abusive potential of such an early filing has been greatly magnified, though, since Congress created the new option for Subchapter V in Chapter 11. Eligibility for that subchapter, as set out in Section 101(51D), requires that the debtor have no more than $7.5 million in "*noncontingent, liquidated*" debt. While those provisions do not require an actual judgment or settlement if the debt is "readily and precisely determined" by reference to some objective criteria, *see, e.g., In re Diamonds & Diamonds, Inc.*, 2019 Bankr. LEXIS 1237 at **22-23 (Bankr. D. P.R. 2019) and cases cited therein, it is certainly clear that establishing the debt levels will be more difficult if the bankruptcy is filed before such formal actions occur. Thus, if a financially healthy entity chooses to file while the charges against it are still being investigated and analyzed (or perhaps even before evidence of wrongdoing is uncovered), it may be able to claim that it has little or no "liquidated" debt. As such, it can then purportedly qualify for the Subchapter V election despite being a large and thriving enterprise, which surely is not what Congress intended when it enacted these provisions.[16] Certainly, it did not devise Subchapter V as a way to allow entities to launder their potential liability at a bargain basement price by way of a premature filing.

Here, the Debtor took great pains to settle and quickly pay the initial cases filed against it and then filed this case before the rest of the Lear Investigations could come to fruition.[17] By doing so, it now presents a petition that, on the surface, wedges itself within the debt limits for a Subchapter V filing. If it is allowed to retain that election, it can substantially limit the remedies

---

[16] House Report 116-171, p. 2, accompanying H.R. 3311, the Small Business Reorganization Act of 2019 described the bill as being needed because "Small businesses--typically family-owned businesses, startups, and other entrepreneurial ventures form[ed][ the backbone of the American economy" yet were unable to successfully reorganize. The Debtor, which states on its website (learcapital.com), that it has been "America's Precious Metals leader since 1997" and touts its "3 Billion in Trusted Transactions," and is characterized by Mr. Ohanesian as "one of the largest in its industry" (Dkt. 15-3, par. 8) hardly seems to fit that model.

[17] As noted above in the Background Facts, the Debtor also took numerous other steps to make early payments on other amounts owed to ensure that it had no debts on the filing date. Those further efforts to artificially reduce its debts are further evidence of manipulation of the filing limits.

to which the government and other creditors would be entitled while allowing its principals to retain some or all of their equity interests.[18] Without attempting to prejudge the results of the Lear Investigations, it seems entirely possible that, in light of the size of the settlements with the New York Attorney General and the City of Los Angeles [19] the final amount sought therein could be far in excess of the eligibility limits of Subchapter V, but the Debtor seeks to avoid that possibility by filing before its true liability is determined. That filing, far in advance of any actual financial distress, is itself sufficient to show bad faith under the Third Circuit's case law; that conclusion is fortified by the overlay of the attempt to artificially create the right to relief under Subchapter V. In sum, if and when the day arrives when it does need bankruptcy relief, the Debtor can refile its case, and its true status can be determined then. For now, the Filing States respectfully submit that the evidence plainly supports a finding that this case was not brought in good faith, and this Court should so find here and dismiss the petition.

### C.    Alternatively, the Court Should Abstain From Hearing this Case at this Time.

As an alternative to dismissal, Section 305 of the Code also provides that the court "may dismiss a case under this title; or may suspend all proceedings in a case under this title, at any time if (1) the interest of creditors and the debtor would be better served by such dismissal or suspension." Although this section refers to suspending proceedings, the section itself is labeled "Abstention," and courts accordingly use that term when acting to cease processing the case.[20]

---

[18] As noted, the Filing States reserve the right to challenge the Subchapter V election itself at an appropriate time. The fact that the election creates features that disadvantage their ability to fully compensate the consumers they represent is further independent evidence supporting the lack of good faith here.

[19] There may be certain factors unique to those cases that increased their value, but the facial comparison between the settlement amounts agreed to therein, which alone exceeded the debt limits applicable to a Subchapter V case, and the debtor's current posture that "we have no debt," is one of the factors that raises concerns about the *bona fides* of that election.

[20] Permissive abstention is also available for a particular proceeding within the case under 28 U.S.C. § 1334(c)(1) and may be coupled with equitable remand under 28 U.S.C. § 1452(b). But both of those deal with only part of the case and, as there is nothing of substance to this case beyond the Debtor's attempt to

Courts will typically rely on their right to "abstain" as a back-up to their analysis under the dismissal provisions. *See, e.g., Forest Hill, supra,* 364 B.R. at 822-23 (even if case was not dismissed, factors pointing in that direction would warrant abstention); *In re First Plus Fin. Enters., Inc.*, 99 B.R. 751, 755 (Bankr. W.D. Tex. 1989) (abstention warranted where purpose was to do indirectly what debtor could not do directly; i.e., to defeat the imposition of regulatory receivership and conservatorship of assets of a subsidiary that was itself ineligible for bankruptcy).

Courts that consider abstention typically look at factors such as (1) whether another forum is available or there is already a pending action in another court; (2) whether the creditor and debtor are actively engaged in an out of court workout; (3) the purpose for which bankruptcy jurisdiction has been sought; (4) whether the bankruptcy will unnecessarily interfere with state or federal regulatory schemes; and (5) the effect the bankruptcy proceeding will have on the debtor's business. *See In re Forever Propane Sales & Serv.*, 597 B.R. 696, 697 (Bankr. S.D. Fla. 2019); *In re Paper I Partners, L.P.,* 283 B.R. 661, 679 (Bankr. S.D. N.Y. 2002) (using a roughly similar list broken out into seven factors).

Here, this case is much akin to a two-party dispute, with the multiple states essentially forming one party and the Debtor the other. The purpose for which bankruptcy jurisdiction is sought is an improper attempt to gain a tactical advantage over the states, as set out above, and would improperly interfere with the states' regulatory processes. Absent being able to gain such an improper advantage, the bankruptcy is an unnecessary drag on the time and finances of the debtor and its management. The time and expenses spent negotiating over a resolution of the states' claims must be spent in any event; the time and expenses spent adding the bureaucratic toppings

---

pull the Lear Investigations into a bankruptcy forum, there is little reason to use those provisions as opposed to abstaining from hearing the case as a whole.

of a Chapter 11 bankruptcy onto those discussions are not.[21]  As such, suspending the bankruptcy proceedings would be financially beneficial to the Debtor as well.

Even if the Court does not dismiss the case entirely, a substantial suspension of the proceedings (for at least six months) would benefit all parties by letting the ISSRs complete the investigatory process and potentially facilitate settlement discussions without the costs and administrative burdens of a bankruptcy filing. *See, e.g., In re Picacho Hills Util. Co.,* 2013 Bankr. LEXIS 1733 at **26-32 (Bankr. D. N.M. 2013) (following approach taken in *In re Massacone*, 183 B.R. 402 (Bankr. E.D. Pa. 1995), *aff'd* 200 B.R. 568 (E.D. Pa. 1996) (suspending all proceedings for six months to allow certain actions to be resolved outside of bankruptcy court) and other cases cited therein).[22]

## CONCLUSION

Accordingly, the Filing States aver that dismissal is the most appropriate option and is fully warranted in this matter. However, abstention is also available to the Court as an alternative if it chooses not to dismiss the case altogether at this point. If so, all proceedings herein should be suspended for a period of not less than six months, at which point the parties can submit a status report and the Court may determine what further action should be taken.

Dated: April 22, 2022               Respectfully submitted,
Wilmington, Delaware

                                    By: /s/ *Karen Cordry*
                                    Karen Cordry (DC Bar No. 278051)
                                    National Association of Attorneys General

---

[21] As just one example, the cost to mail notice of the case to all of the debtor's investors undoubtedly cost tens of thousands of dollars if not more and likely engendered many questions that its staff has had to spend time answering.

[22] Perhaps the most similar case is In *In re Schur Mgmt. Co.*, 323 B.R. 123, 127 (Bankr. S.D. N.Y. 2005), where the debtor sought abstention in the face of a motion to dismiss by the creditor. The court agreed with the creditor that the case was premature, citing *SGL Carbon*, *Marsch*, and *Coastal Cable*, and, as such, the case should simply be dismissed as it would not be in the best interests of creditors for it to leave the matter hanging. The Filing States agree that dismissal is more appropriate, but if the Court does wish to keep control over the matter, abstention could be used instead to alleviate the prejudice from the current filing.

1850 M St., NW, 12th Floor
Washington, DC 20036
Telephone:     (202) 326-6025
                        (301) 933-3640 (current use)
E-mail: kcordry@naag.org

ATTORNEY FOR THE FILING STATES listed in
APPENDIX A

**FOR THE STATE OF COLORADO**

By: */s/ Robert Finke*
Robert Finke, 40756*
First Assistant Attorney General
1300 Broadway, 8th Floor
Denver, CO  80203
Telephone: (720) 508-6376
Email:  Robert.Finke@coag.gov

ATTORNEY FOR THE COLORADO SECURITIES
COMMISSIONER

**FOR THE STATE OF MARYLAND**

BRIAN E. FROSH
ATTORNEY GENERAL OF THE STATE OF
MARYLAND

By: */s/ Max F. Brauer*
Max F. Brauer
(Maryland State Does Not Use Bar Numbers)
Assistant Attorney General
Maryland Office of the Attorney General
Securities Division
200 Saint Paul Place, 25th Floor
Baltimore, MD 21202
Telephone: (410) 576-6950
Facsimile: (410) 576-6532
mbrauer@oag.state.md.us

ATTORNEY FOR THE STATE OF MARYLAND EX REL
MARYLAND SECURITIES COMMISSIONER

**FOR THE STATE OF TENNESSEE**

Tennessee Attorney General & Reporter
HERBERT H. SLATERY III

By: /s/ Laura L. McCloud
LAURA L. MCCLOUD (TN BPR 16206)
Senior Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 532-8933

ATTORNEY FOR THE STATE OF TENNESSEE

**FOR THE STATE OF TEXAS**

By: */s/ Abigail R. Ryan*
ABIGAIL R. RYAN
Texas State Bar No. 24035956
Office of the Attorney General of Texas
Bankruptcy & Collections Division
P. O. Box 12548 MC008
Austin, Texas 78711-2548
Telephone: (512) 463-2173
Facsimile: (512) 936-1409
abigail.ryan@oag.texas.gov

ATTORNEY FOR THE TEXAS STATE SECURITIES
BOARD

**FOR THE STATE OF VERMONT**

By: /s/ Jennifer Rood
JENNIFER ROOD, Assistant General Counsel
Vermont Bar No. 5515
Vermont Department of Financial Regulation
89 Main Street, Third Floor
Montpelier, VT 05620
(802)828-5672
Jennifer.rood@vermont.gov

ATTORNEY FOR THE VERMONT DEPARTMENT OF
FINANCIAL REGULATION

**FOR THE STATE OF WASHINGTON**

By: */s/ Stephen Manning*
STEPHEN S. MANNING
Washington State Bar No. 36965

Washington Department of
Financial Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524
Stephen.Manning@atg.wa.gov

ATTORNEY FOR THE WASHINGTON DEPARTMENT OF
FINANCIAL INSTITUTIONS, SECURITIES DIVISION

**FOR THE STATE OF WISCONSIN**

JOSHUA L. KAUL
Attorney General of Wisconsin

By: /s/ Michael D. Morris
MICHAEL D. MORRIS
Assistant Attorney General
State Bar #1112934
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3936
(608) 294-2907 (Fax)
morrismd@doj.state.wi.us

ATTORNEYS FOR THE STATE OF WISCONSIN
DEPARTMENT OF FINANCIAL INSTITUTIONS

**APPENDIX A**

FILING STATES REPRESENTED BY KAREN CORDRY:

Alabama Securities Commission

Arkansas Securities Department

State of Arizona ex rel. Arizona Corporation Commission

California Commissioner of Financial Protection and Innovation

District of Columbia Dept. of Insurance, Securities and Banking Commissioner

Delaware Department of Justice, Investor Protection Unit

Hawaii Office of the Attorney General

Idaho Department of Finance

Kentucky Department of Financial Institutions, Division of Securities

Louisiana Office of Financial Institutions

Michigan Department of Attorney General

Maine Securities Administrator

Missouri Securities Enforcement Counsel

Montana Commissioner of Securities & Insurance

New Hampshire Bureau of Securities Regulation

Ohio Department of Commerce, Division of Securities

Puerto Rico Office of the Commissioner of Financial Institutions

South Carolina Office of the Attorney General

Utah Securities Division